No. 83-26

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

---

IN THE MATTER OF C.H.,
A Youth under the age of Eighteen.

---

APPEAL FROM: District Court of the First Judicial District,
In and for the County of Lewis & Clark,
The Honorable Gordon Bennett, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Jackson Law Firm; James A. Rice, Jr. argued,
Helena, Montana

For Respondent:

Mike Greely, Attorney General, Helena, Montana
James Scheier argued, Asst. Atty. General, Helena
Mike McGrath, County Attorney, Helena, Montana

---

Submitted: January 10, 1984

Decided: May 29, 1984

Filed: MAY

Ethel M. Harrison
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

C.H., a youth under the age of 18, appeals from two orders of the Youth Court of Lewis and Clark County: (1) an order adjudging her to be a delinquent youth and sending her to Mountain View School for Girls for a 45-day predispositional evaluation; and (2) an order placing her on formal probation for one year. We affirm these orders of the Youth Court.

The stipulated statement of the issue on appeal is: Whether the Montana Youth Court Act, which allows a youth in need of supervision, who has violated her probation, to be adjudged a delinquent youth, is unconstitutional as a violation of the due process, equal protection, and/or cruel and unusual punishment provisions of the United States and Montana Constitutions. Appellant asserts that a juvenile status offender who violates the terms of her probation should not be deemed a delinquent youth and subjected to greater punishment for the same conduct that originally gave the youth court authority to designate her a youth in need of supervision.

On December 9, 1981, a deputy county attorney petitioned the Lewis & Clark County Youth Court to declare C.H. a youth in need of supervision for the offense of habitual truancy, a violation of section 41-5-103(13)(c), MCA. C.H. was 14 years old at the time. At the February 24, 1982 hearing, C.H. admitted to having been truant from school. The youth court ordered C.H. to attend all her high school classes, to attend counseling sessions, to attend tutoring sessions with each teacher, to follow certain procedures in case of absences, and to be evaluated by a clinical psychologist. This order also specified:

2

". . . that if C.. . . has any unexcused absences or in any way violates the terms and conditions of this Order, she may be brought back to court for further disposition; or in the alternative, the Lewis and Clark County Attorney's office can file a new Petition asking that she be declared a delinquent youth." Consent Order, March 2, 1982.

C.H., her mother, her attorney and the deputy county attorney expressly consented to and signed this order.

Six days later, the deputy county attorney informed the court that C.H. had violated the consent order by failing to attend school on March 3, 1984. The new petition alleged that C.H. was a delinquent youth under the provisions of the Montana Youth Court Act.

At the March 8, 1984 probable cause hearing on the delinquency petition, the school assistant principal testified that C.H. had "not been at school one full day" since the court order. After a full hearing on the merits, the youth court ordered a predispositional evaluation. C.H. was committed to Mountain View School for Girls for a period of 45 days for the purpose of undergoing the evaluation.

After receipt of the evaluation and a supplemental report to the court from a probation officer, a dispositional hearing was held. In accordance with Mountain View's recommendations, the court ordered C.H. placed on formal probation for one year, subject to the following conditions:

"1) That the youth attend school at the Helena Alternative School on a regular basis, with no unexcused absences; and 2) that the conduct of the youth be that of a law-abiding citizen and that said youth shall obey all laws promulgated by lawful authority."

Nothing in the record indicates that C.H. had any truancy or other problems after this final order of December 16, 1982. On the contrary, a report from her probation officer indicates that C.H.'s attendance at the Alternative School has been excellent.

3

I

In In re Gault (1967), 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527, the United States Supreme Court set forth the history and theory underlying the juvenile justice system and commented on its constitutional problems as follows:

> ". . . The Juvenile Court movement began in this country at the end of the last century. From the juvenile court statute adopted in Illinois in 1899, the system has spread to every State in the Union, the District of Columbia, and Puerto Rico. The constitutionality of Juvenile Court laws has been sustained in over 40 jurisdictions against a variety of attacks.

> "The early reformers were appalled by adult procedures and penalties, and by the fact that children could be given long prison sentences and mixed in jails with hardened criminals. They were profoundly convinced that society's duty to the child could not be confined by the concept of justice alone. They believed that society's role was not to ascertain whether the child was 'guilty' or 'innocent,' but 'What is he, how has he become what he is, and what had best be done in his interest and in the interest of the state to save him from a downward career.' The child -- essentially good, as they saw it -- was to be made 'to feel that he is the object of [the state's] care and solicitude,' not that he was under arrest or on trial. The rules of criminal procedure were therefore altogether inapplicable. The apparent rigidities, technicalities, and harshness which they observed in both substantive and procedural criminal law were therefore to be discarded. The idea of crime and punishment was to be abandoned. The child was to be 'treated' and 'rehabilitated' and the procedures, from apprehension through institutionalization, were to be 'clinical' rather than punitive." 387 U.S. at 14-16, 87 S.Ct. at 1437, 18 L.Ed.2d at 539.

Since juvenile courts were civil in nature, they were not originally held to any of the constitutional safeguards afforded to adults in criminal proceedings. Mudd, The Constitution and Juvenile Delinquents, 32 Mont.L.Rev. 307, 308 (1971). As constitutional case law developed in this area, substantive due process was afforded to juveniles. For example in In re Gault, the U.S. Supreme Court held that a 15 year old was entitled to adequate notice, assistance of

counsel and the privilege against self-incrimination during delinquency proceedings.

Today, one of the most hotly debated issues in the field of juvenile justice is the proper scope of juvenile court jurisdiction over noncriminal misbehavior, i.e., conduct that is unlawful for juveniles but not for adults. See United States Department of Justice, Standards for the Administration of Juvenile Justice (1980) at 249. "Children's conduct over which the juvenile court exercises jurisdiction is commonly viewed as falling into two categories: (1) delinquency -- conduct of juveniles which would constitute a violation of a criminal statute if committed by an adult, and (2) status offenses -- children's behavior which would not be criminal if committed by an adult." National Center for Juvenile Justice, Juvenile Court Jurisdiction over Children's Conduct (1980) at 1. This second category of "status offender" is the focus of national debate generally and a primary issue of this case. "A status offender is commonly defined as one whose acts are proscribed solely because of his age. Runaways and school truants account for the largest number of these youngsters." Quinn & Hutchison, Status Offenders Should Be Removed from the Juvenile Court, 7 Pepperdine L.Rev. 923, 926 (1980).

Montana's Youth Court Act is contained in Title 41, Chapter 5, MCA. Under the Act, a status offender is generally labeled a youth in need of supervision; and a "criminal" offender is generally labeled a delinquent youth. However, the youth court has discretion to regard a child who commits delinquent acts, as a youth in need of supervision.

Section 41-5-103(12), MCA defines a "delinquent youth" as a youth:

"(a) who has committed an offense which, if committed by an adult, would constitute a criminal offense;

"(b) who, having been placed on probation as a delinquent youth or a youth in need of supervision, violates any condition of his probation."

Section 41-5-103(13), MCA defines a "youth in need of supervision" as a youth:

". . . who commits an offense prohibited by law which, if committed by an adult, would not constitute a criminal offense, including but not limited to a youth who:

"(a) violates any Montana municipal or state law regarding use of alcoholic beverages by minors;

"(b) habitually disobeys the reasonable and lawful demands of his parents or guardian or is ungovernable and beyond their control;

"(c) being subject to compulsory school attendance, is habitually truant from school; or

"(d) has committed any of the acts of a delinquent youth but whom the youth court in its discretion chooses to regard as a youth in need of supervision."

Subsections (a)-(c) define status offenses, including truancy. Subsection (d) is the overlap provision, which gives the youth court discretion to treat the more serious misconduct of a delinquent youth, as the misbehavior of a youth in need of supervision.

C.H. admitted to habitual truancy, a violation of section 41-5-103(13)(c), MCA. She was designated a youth in need of supervision and ordered to attend school. By failing to attend school, she violated a condition of the court's order, thereby falling within the definition of delinquent youth contained in section 41-5-103(12)(b), MCA.

The court adjudged her to be a delinquent youth and ordered her to undergo a 45-day evaluation at Mountain View prior to the dispositional hearing. Section 41-5-523(e), MCA permits the court to order such "evaluation that the court considers beneficial to the youth." Subsection 41-5-523(d),

6

MCA permits the court to transfer legal custody of a delinquent youth to the Department of Institutions. That same subsection prohibits transfer of a youth in need of supervision to a state youth correctional facility, such as Mountain View. Standing alone, the youth court's procedure of ordering a delinquent youth evaluated prior to making a final disposition is statutorily proper. The problem here is how C.H. became a "delinquent youth."

By continuing to be truant from school, the same status offense that originally placed her within the jurisdiction of the youth court, C.H. became subject to being adjudicated as a delinquent youth. Her misconduct could be classified as the status offense of truancy or as the delinquent act of contempt of a court order. The Youth Court Act defines truancy as a status offense only, but violation of a court order may be deemed a status or delinquent offense. Sections 41-5-103(13)(c) & (12)(b), MCA. Thus the Montana Legislature has left resolution of this issue to be determined on a case-by-case basis at the discretion of the youth court.

This Court recognizes that there is a national trend to exclude non-criminal conduct from the delinquency category of juvenile offenses. In 1977, twenty-six states expressly included some non-criminal conduct (status offenses) in the delinquency category. In 1980, nineteen states expressly included status-type conduct in the delinquency category. National Center for Juvenile Justice, Juvenile Court Jurisdiction over Children's Conduct (1980).

Montana is one of three states that permits violation of a youth court order to be classified as either a delinquent act or a status offense (Arizona, Illinois, Montana). In eight states, such conduct is a delinquent offense (Colorado,

7

Florida, Kansas, Nevada, Ohio, Oklahoma, Texas, West Virginia). In Montana, a youth in need of supervision-status offender who violates a court order _may_ be adjudicated delinquent. Appellant asks this Court to restrict that option on constitutional grounds.

## II

Due process is defined as the constitutional guaranty that no one shall be arbitrarily deprived of her life, liberty or property. The essence of substantive due process is that the State cannot use its police power to take unreasonable, arbitrary or capricious action against an individual. The guaranty of due process "demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained." Nebbia v. New York (1934), 291 U.S. 502, 525, 54 S.Ct. 505, 510-11, 78 L.Ed. 940, 950.

Appellant contends that the Youth Court Act is unconstitutional in that graduation of a youth in need of supervision who violates a condition of her probation to the status of delinquent youth is unreasonable, arbitrary and capricious. She also claims that the State denied her procedural due process by failing to give adequate notice that her admission of truancy could later be used as the basis of an adjudication of delinquency.

The State contends that the statutory scheme allows the youth court to apply a more intensive rehabilitation plan to a youth who is demonstrating serious lack of respect for the law. Both parties agree that the primary purpose of the Youth Court Act is rehabilitation and that rehabilitation of youthful offenders is a legitimate state purpose. The

8

question here is whether the means chosen to achieve that purpose violate due process guarantees.

In considering legislation in light of a substantive due process claim, this Court subscribes to the rational basis standard. The legislation will be upheld if the laws have a reasonable relation to a proper legislative purpose. Linder v. Smith (Mont. 1981), 629 P.2d 1187, 1192, 38 St.Rep. 912, 917. For due process purposes, the court's action does not have to be the only alternative or even the best alternative for the procedure to be reasonable and constitutional. See Montana Wildlife Federation v. Sager (Mont. 1980), 620 P.2d 1189, 1198, 37 St.Rep. 1897, 1906.

The youth court's discretion to designative juvenile offenders on an individual basis, as delinquent youths or youths in need of supervision, is akin to its discretion to waive jurisdiction based on the individual facts of the case. Section 41-5-206, MCA permits a youth court to transfer jurisdiction over a delinquent youth to a district court. The Act permits the court to waive jurisdiction over a youth who requires treatment "beyond that afforded by juvenile facilities." Section 41-5-206(1)(d)(ii), MCA. Exercise of a youth court's discretion to waive jurisdiction and to transfer a juvenile to a criminal court has been repeatedly upheld. See State v. Rodriguez (Mont. 1981), 628 P.2d 280, 38 St.Rep. 578; Lujan v. District Court of Fourth Judicial District (1973), 161 Mont. 287, 505 P.2d 896. Substantive due process does not require the youth court to treat all juveniles charged with the same offense in an identical manner.

Section 41-5-523(1)(d), MCA prohibits placement of a youth in need of supervision in a state youth correctional facility. This prohibition is in line with the national

9

trend to segregate status offenders from youths who have committed offenses that would be criminal acts if committed by an adult. Appellant relies on State ex rel. Harris v. Calendine (W.Va. 1977), 233 S.E.2d 318 to support her arguments that a truant should never be placed in a state youth correctional facility and that such placement is unreasonable.

In Harris, a 16 year old boy was adjudged "a delinquent child" for being truant from school for 50 days. The juvenile court committed him to the custody of the Commissioner of Public Institutions for assignment to the State Industrial School for Boys. Harris was ordered to attend school for nearly a year past the age of attendance required by state law. The West Virginia Supreme Court was concerned with incarceration of children for status offenses such as truancy. It found unconstitutional statutes that permitted the juvenile court to classify and treat status offenders in the same manner as criminal offenders:

> ". . . insofar as they result in the commitment of status offenders to secure, prison-like facilities which also house children guilty of criminal conduct, or needlessly subject status offenders to the degradation and physical abuse of incarceration." 233 S.E.2d at 325.

The Court held that the State must exhaust every reasonable alternative to incarceration before committing a status offender to a prison-like facility. The Court stated that status offenders and juvenile criminal offenders could only be housed and educated together "in shelter homes, residential treatment centers, and other modern facilities . . . where the atmosphere is characterized by love and concern . . . ." 233 S.E.2d at 329.

The Harris case is distinguishable on many points. Unlike Gilbert Harris, C.H. had appeared before the juvenile

10

court prior to being adjudicated a delinquent youth. Not only had C.H. previously appeared before the court, she signed the order that she violated just days later. She was transferred to Mountain View School for Girls for a 45-day predispositional evaluation after violating the court order. Unlike Harris, she was not confined for a period of years in a youth correctional facility for the status offense of truancy.

The most critical distinguishing factor and the fact on which this case turns is C.H.'s violation of the March 2, 1982 consent order. The conditions of that order exceed the statutory prohibition against truancy. Section 20-5-103(1), MCA compels school attendance until the child's 16th birthday or completion of the 8th grade, whichever occurs later. At the time she was first brought before the youth court, C. H. was a 14 year old high school student. In the consent order of March 2, 1982, C.H. agreed to:

> "2. . . . attend all scheduled counseling sessions provided by the school.
>
> "3. . . . fully participate in and cooperate with the program put before her by Special Services.
>
> "4. . . . set up appointments with each teacher for tutoring and . . . attend all scheduled tutoring sessions.
>
> "5. In case of absence, the following procedures shall be followed:
> a. If C.H.. . . is absent for one period, . . . her mother, shall contact . . . High School.
> b. If C.H. is absent for three periods, or more, . . . High School may send a nurse and a school official to the family home.
> c. If C.H. . . . is absent for two days or more, she shall bring a Doctor's excuse before being re-admitted to the High School."

In addition, C.H. consented to being evaluated by a clinical psychologist and to participating in family counseling with her mother. These conditions of the consent order clearly extend beyond the statutory duty to attend school.

11

The assistant principal verified the violation of condition 5(c) of the order by testifying that C.H. failed to provide a doctor's excuse for her non-attendance. The assistant principal also testified that she and a school nurse had called the family home on a day when C.H. had missed three periods of school without explaining the absence. No one answered.

The youth court exercised its discretion, under section 41-5-103(12)(b), MCA, in designating C.H. a delinquent youth. Where the order of a youth court has been violated and the authority of the court has been treated with contempt, we do not believe that the primary purpose of rehabilitation would be served by requiring the court to, in effect, ignore the violation and treat the youth as though no violation had occurred. Neither could that purpose be fulfilled by restricting the youth court to only those forms of supervision and control that existed prior to the act of contempt for the court's authority. The youth court did not act unreasonably, arbitrarily or capriciously in designating C.H. a delinquent youth. Section 41-5-103(13)(d), MCA, which authorized the court to designate C.H. as either a youth in need of supervision or a delinquent youth, bears a reasonable relation to the legitimate state purpose of rehabilitating youthful offenders.

Appellant also asserts that she was not given adequate notice that her initial admission of truancy could later be used as a basis for adjudging her a delinquent youth. We find this argument to be without merit. The consent order that formed the basis for the delinquency proceeding stipulated that:

> "IT IS FURTHER ORDERED, that if . . . [C.H.] in any way violates the terms and conditions of this Order, . . . the Lewis and Clark County Attorney's

12

office can file a new Petition asking that she be
declared a delinquent youth."

This order was signed by the youth court judge, C.H., her
attorney, her mother and the deputy county attorney. The
above-quoted provision expressly notified C.H. that if she
failed to comply with the terms of the order, she might be
adjudged a delinquent youth.

We hold that the youth court's actions did not violate
procedural due process guarantees and that the Youth Court
Act does not violate substantive due process rights.

III

The Fourteenth Amendment of the United States
Constitution and Art. II, Sec. 4 of the 1972 Montana
Constitution guaranty equal protection of the laws to all
persons. The equal protection provisions of the federal and
state constitutions are similar and provide generally
equivalent but independent protections. Emery v. State
(1978), 177 Mont. 73, 580 P.2d 445, cert. den. 439 U.S. 874,
99 S.Ct. 210, 58 L.Ed.2d 187.

When a statute is challenged on equal protection
grounds, the first step is to identify the classes involved
and determine whether the classes are similarly situated.
The classes involved in this challenge to the Youth Court Act
are "youths in need of supervision" and "delinquent youths,"
who have violated a youth court order. Since both classes are
composed of youths who have committed the same act, the
classes are similarly situated for equal protection purposes.

In order to determine which standard of review applies
to the challenged legislation, we next determine whether a
suspect classification is involved. A suspect class is one
"saddled with such disabilities, or subjected to such a
history of purposeful unequal treatment, or relegated to such

13

a position of political powerlessness as to command extraordinary protection from the majoritarian political process." San Antonio School District v. Rodriguez (1973), 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16, 40. Youthful contemners who have been deemed delinquent youths do not constitute a suspect class for purposes of equal protection.

Next we define the nature of the individual interest affected. A careful inquiry is required into "the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose [and] the existence of alternative means for effectuating the purpose . . ." Bearden v. Georgia (1983), ____ U.S. ____, 103 S.Ct. 2064, 2069, 76 L.Ed.2d 221, 229, quoting Willims v. Illinois (1970), 399 U.S. 235, 260, 90 S.Ct. 2018, 26 L.Ed.2d 586 (Harlan, J., concurring).

Appellant contends that physical liberty is a fundamental right. She argues that institutionalization of a truant status offender constitutes an infringement upon that fundamental right, which must be protected absent a compelling state interest. Appellant further asserts that section 41-5-103(12), MCA is unconstitutional in that it authorizes the youth court to reclassify, as a delinquent youth, a youth in need of supervision who has violated a court order. She argues that this classification option violates equal protection guarantees in that the court may treat youths in the same class, i.e. youthful contemners, differently.

"The Equal Protection Clause was intended as a restriction on state legislative action inconsistent with elemental constitutional premises." Plyler v. Doe (1982),

14

457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786, 799. The principal purpose of the equal protection clauses of the federal and Montana constitutions is to insure that persons are not the subject of arbitrary and discriminative state action. Godfrey v. Mont. State Fish & Game Com'n (Mont. 1981), 631 P.2d 1265, 1267, 38 St.Rep. 661, 663. To protect against such arbitrary and discriminative state action, certain unarticulated rights are acknowledged to be inclusive in other enumerated constitutional guarantees. For example, the rights of association and privacy, the right to be presumed innocent, a criminal defendant's right to be judged by a standard of proof beyond a reasonable doubt, and the right to travel appear nowhere in the Constitution or Bill of Rights. Yet these important, unarticulated rights have nonetheless been found worthy of constitutional protection. Fundamental rights, even though not expressly guaranteed, have been recognized by the United States Supreme Court as indispensable to the enjoyment of rights explicitly defined. Richmond Newspapers, Inc. v. Virginia (1980), 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973.

The United States Supreme Court has not elevated physical liberty to the status of a fundamental right. The Supreme Courts of California and Washington have chosen to do so in cases where the maximum sentence imposed on juveniles far exceeded the standard maximum for adults who committed the same offense. See State v. Rice (Wa. 1982), 655 P.2d 1145, People v. Olivas (Ca. 1976), 551 P.2d 375. The Washington Supreme Court reasoned that:

> ". . . The Supreme Court of the United States has recognized as fundamental the right to vote, freedom of expression, and the right to procreation. None of these rights have any meaning in the absence of liberty, the freedom from physical restraint. Accordingly, we recognize the

15

individual's interest in liberty is a fundamental right for the purpose of equal protection analysis.

"Therefore, the appropriate standard of review to be applied in this case is the strict scrutiny test." Rice, 655 P.2d at 1154 (citations omitted).

A variety of equal protection tests other than strict scrutiny has been applied in cases where infringement of physical liberty was claimed by adults. McGinnis v. Royster (1973), 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (rational basis test); O'Connor v. Donaldson (1975), 422 U.S. 563, 574-76, 95 S.Ct. 2486, 45 L.Ed.2d 396 (unenuciated, but stricter than rational basis standard); Bearden v. Georgia (1983), _____ U.S. _____, 103 S.Ct. 2064, 76 L.Ed.2d 221 ("careful inquiry" without "pigeon-hole analysis," enhanced scrutiny).

In Plyler v. Doe (1982), 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (reh. den. 458 U.S. 1131, 103 S.Ct. 14, 73 L.Ed.2d 1401), the Court distinguished strict scrutiny from the "intermediate" scrutiny applied to substantial interests that do not rise to the level of fundamental rights.

"The Equal Protection Clause was intended as a restriction on state legislative action inconsistent with elemental constitutional premises. Thus we have treated as presumptively invidious those classifications that disadvantage a 'suspect class,' or that impinge upon the exercise of a 'fundamental right.' With respect to such classifications, it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve as a compelling governmental interest. In addition, we have recognized that certain forms of legislative classification, while not facially invidious, nonetheless give rise to recurring constitutional difficulties; in these limited circumstances we have sought the assurance that the classification reflects a reasoned judgment consistent with the ideal of equal protection by inquiring whether it may fairly be viewed as furthering a substantial interest of the State." 457 U.S. at 217-18, 102 S.Ct. at 2394-95, 72 L.Ed.2d at 799-800.

Because the United States Supreme Court has not ruled on the issue of whether a juvenile's physical liberty is a

fundamental right, subject to constitutional protection and strict scrutiny equal protection analysis, we look to the 1972 Constitution of the State of Montana.

The preamble to the Montana Constitution states in part:

"We the people of Montana . . . desiring . . . to secure the blessings of liberty . . . do ordain and establish this constitution."

Article II is the Declaration of Rights. Article II, Sec. 3 states in part:

"All persons are born free and have certain inalienable rights. They include . . . the rights of . . . enjoying and defending their lives and liberties . . ."

Article II, Sec. 4, the equal protection clause, states in pertinent part:

"The dignity of the human being is inviolable. No person shall be denied the equal protection of the laws."

Article II, Sec. 17, the due process clause, states:

"No person shall be deprived of life, liberty, or property without due process of law."

Reading the preamble and these sections of our constitution together, we hold that under the Montana Constitution physical liberty is a fundamental right, without which other constitutionally guaranteed rights would have little meaning. We conclude that the deprivation of the physical liberty of C.H. for a period of 45 days is sufficient to constitute an infringement upon her right of physical liberty. Having addressed the nature of the right affected and the extent to which it was affected, our next step is to determine whether there is a compelling state interest sufficient to warrant such an infringement.

In contrast to the federal constitution, the Montana Constitution specifically compares the rights of children with those of adults. It recognizes that the State's

17

interest in protecting children may conflict with their fundamental rights. Article II, Sec. 15 provides:

> "The rights of persons under 18 years of age shall include . . . all the fundamental rights of this Article unless specifically precluded by laws which enhance the protection of such persons."

The comments of the Bill of Rights Committee, which proposed adoption of this section, indicate intent to extend fundamental rights to children and to afford constitutional protection to those rights with that one exception.

> "The committee adopted, with one dissenting vote, this statement explicitly recognizing that persons under the age of majority have all the fundamental rights of the Declaration of Rights. The only exceptions permitted to this recognition are in cases in which rights are infringed by laws designed and operating to enhance the protection for such persons. The committee took this action of recognition of the fact that young people have not been held to possess basic civil rights. Although it has been held that they are 'persons' under the due process clause of the Fourteenth Amendment, the Supreme Court has not ruled in their favor under the equal protection clause of that same amendment. What this means is that persons under the age of majority have been accorded certain specific rights which are felt to be a part of due process. However, the broad outline of the kinds of rights young people possess does not yet exist. This is the crux of the committee proposal: To recognize that persons under the age of majority have the same protections from governmental and majoritarian abuses as do adults. In such cases where the protection of the special status of minors demands it, exceptions can be made on clear showing that such protection is being enhanced." Committee Report, Vol. II, 634-36 (1971-72) (emphasis added).

Although no such provision exists in the federal constitution, the United States Supreme Court has recognized three reasons justifying the conclusion that constitutional rights of children cannot be equated with those of adults. The Supreme Court has recognized that the interests of minors and adults are quantitatively different because of the particular vulnerability of children, their inability to make critical decisions in an informed, mature manner, and the importance of the parental role in child rearing. See

Bellotti v. Baird (1979), 443 U.S. ~~662~~ 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (reh. den. 444 U.S. 887, 100 S.Ct. 185, 62 L.Ed.2d 121). Likewise, we hold that a juvenile's right to physical liberty must be balanced against her right to be supervised, cared for and rehabilitated. This is precisely what the drafters of the 1972 Montana Constitution had in mind when they explicitly recognized that persons under 18 years of age would enjoy the same fundamental rights as adults, unless exceptions were made for their own protection.

The statutory power of the youth court to classify a juvenile as a delinquent youth or a youth in need of supervision, depending upon the individual circumstances of the case, reflects two legitimate, compelling state purposes: (1) to rehabilitate youthful offenders by providing for their care, protection and wholesome mental development before they become adult criminals, and (2) to substitute a program of supervision, care and rehabilitation and remove the element of retribution from a youth who has violated the law. The youth court's statutory authority to classify contempt of court, depending upon the circumstances of the case, permits the court to fashion an appropriate, individual rehabilitation plan for each youthful contemner.

As noted in In the Matter of Geary (1977), 172 Mont. 204, 209, 562 P.2d 821, 824, the fact that a youth has been adjudged a delinquent youth "usually demonstrates the need for stronger and wiser authority than has been exercised by the parents . . ." In the initial petition in this case, both C.H. and her mother agreed to follow a specific set of school standards. Both the mother and C.H. were unable to abide by these standards. The authorities are to be commended for responding immediately when it became apparent that C.H. and her mother were unable to abide by the court's

19

requirements. The youth court's immediate response to an apparent inability in the home indicates the type of supervisory responsibility needed to rehabilitate the youth.

As a result of the obvious need, which could not be met by the mother and C.H. herself, the court was required to determine what next should be done. Because C.H. violated conditions of the court order so soon after her express agreement to abide by its conditions, it was appropriate for the court to conclude that she was a delinquent youth. In order to determine which rehabilitation alternative would be most appropriate in C.H.'s case, the court ordered commitment for a 45-day evaluation. This 45-day period was not an unreasonable period of time in order to secure a predispositional evaluation. The youth court followed the recommendations of the evaluation in the final disposition order. The record indicates that C.H. has completed a successful school year.

Upon these facts, we hold that the power of the youth court to classify the contempt of court misconduct of juvenile offenders on a case-by-case basis does not violate equal protection guarantees.

IV

Like the first two constitutional challenges, appellant's assertion that the Act violates the prohibition against cruel and unusual punishment is premised upon the erroneous assumption that she was merely a truant, status offender at the time she was adjudged a delinquent youth. In fact, she was a contemner. She had violated the court's order, in addition to committing a status offense.

The standard as to what constitutes cruel and unusual punishment tends to change as social norms change and society becomes more enlightened. A sentence within statutory limits

is presumed not to be cruel and unusual punishment. State v. Austad (Mont. 1982), 641 P.2d 1373, 39 St.Rep. 356.

Section 41-5-522(2), MCA directs the court to order a predispositional report in writing by a probation officer. It also authorizes the court to have the youth examined and the results of the examination included in the predispositional report. Section 41-5-523(1)(e), MCA authorizes the court to order such "evaluation that the court considers beneficial to the youth." Neither statute specifies a time limitation in which the evaluation must be completed.

Here, C.H. was ordered to undergo a 45-day evaluation. Thereafter, she was placed on formal probation for a period of one year. She was allowed to live at home while attending school during this probationary period. The terms of these two orders fall within the purview of sections 41-5-522(2) and 41-5-523(1)(e), MCA. The record reflects that C.H. actually benefitted from the youth court's supervision and individualized rehabilitation plan.

We hold that the youth court's orders, committing C.H. to Mountain View for a 45-day predispositional evaluation and placing her on formal probation for one year, do not constitute cruel and unusual punishment.

We affirm the orders of the youth court.

Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices

22