No. 00-507

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 129

ALICE P. KLOSS,

        Plaintiff and Appellant,

    v.

EDWARD D. JONES & CO., a limited partnership,
and PAUL HUSTED,

        Defendants and Respondents.

FILED

JUN 13 2002

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Eighth Judicial District,
                In and for the County of Cascade,
                The Honorable Julie Macek, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                Joseph C. Engel, III, P.C., Attorney at Law, Great Falls, Montana

        For Respondents:

                Robert F. James, Ugrin, Alexander, Zadick & Higgins, Great Falls, Montana

        For Amicus (Montana Trial Lawyers Association):

                Paul J. Petit, Petit and Schultz, PLLP, Missoula, Montana

                            Submitted on Briefs:  October 11, 2001

                                        Decided:  June 13, 2002

Filed:

_____
                Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1    The Appellant, Alice P. Kloss, opened financial services accounts with the Defendants, Edward D. Jones & Co. and Paul Husted, in 1992 and 1998. The agreement between Kloss and Jones contained pre-dispute arbitration clauses. After Kloss filed a complaint in the District Court for the Eighth Judicial District in Cascade County in which she sought damages caused by Husted's wrongful conduct, Jones filed a Motion to Compel Arbitration. The District Court granted the motion and Kloss appealed. While the appeal was pending, Jones located Kloss' 1998 brokerage agreement which was at issue in the District Court. This Court remanded this matter to the District Court for supplemental findings of fact and conclusions of law based on the 1998 account agreement. Following an evidentiary hearing, the District Court granted Jones' Motion to Compel Arbitration. Kloss now appeals from the order compelling arbitration. We reverse the order of the District Court.

¶2    Of the issues presented on appeal, we find the following to be dispositive:

¶3    1. Did the District Court err when it concluded that the arbitration clauses contained in the 1992 and 1998 Full Service Agreements were enforceable?

¶4    2. Did the District Court err when it failed to consider whether Defendants owed Kloss a fiduciary duty to explain the arbitration agreement?

¶5    3. Did the District Court err when it denied Kloss' motion for attorney's fees and costs?

2

## FACTUAL BACKGROUND

¶6 The Appellant, Alice P. Kloss, is a 95 year old widow who was referred to Defendant Paul Husted in 1985. Husted has been employed by Defendant Edward D. Jones & Co. in Great Falls, Montana, as a stockbroker since 1981. Kloss opened a full service brokerage account with Jones on July 30, 1989, which permitted her to purchase securities and maintain a money market account.

¶7 Kloss established a living trust account with Jones in April of 1992. Like the 1989 account, the living trust account agreement contained a mandatory arbitration provision which required that "[a]ny controversy arising out of or relating to any of my accounts or transactions with you, your officers, directors, agents and or/employees . . . shall be settled by arbitration . . . ."

¶8 In early 1998, Kloss went to Husted's office to discuss investment options for a bond that had matured and Husted informed her that she had quite a bit of money and should set up a charitable trust with her bond proceeds. Husted then arranged for Kloss to meet with an attorney, who drafted the documents which created an irrevocable charitable trust.

¶9 On May 28, 1998, Kloss activated the charitable trust account by executing a Customer Account Agreement for Full Service and Customer Loan Accounts (hereinafter 1998 Agreement). The 1998 Agreement also contained a pre-dispute arbitration clause but was not signed by Kloss. Rather, Kloss signed a detachable signature card that acknowledged she received a copy of the 1998 Agreement and incorporated the Agreement's arbitration clause by reference:

3

The Full Service Account and the Customer Loan Account Agreements contain a pre-dispute arbitration clause that is incorporated by reference from the general account provisions on pages 1 and 2. By my signature below, I acknowledge that I have received a copy of this document.

The agreements themselves included the following explanations of rights waived by submission of disputes to arbitration:

The 1992 "Customer Account Agreements for Full Service and Customer Loan Accounts-General Account Provisions" contains a section as follows:

ARBITRATION
1. Arbitration is final and binding on the parties.
2. The parties are waiving their right to seek remedies in court, including the right to jury trial.
3. Pre-arbitration discovery is generally more limited than and different from court proceedings.
4. The arbitrators' awards is not required to include factual findings or legal reasoning, and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.
5. The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

¶10 After the charitable trust was executed, Husted selected and sold assets from Kloss' living trust to fund the charitable trust. The assets sold for approximately $352,000.00, which Husted deposited into a charitable remainder trust in the name of Alice P. Kloss.

¶11 In July 1998, Kloss began to have second thoughts about the charitable trust. She contacted her nephew and requested that he come to Montana, where she gave him power of attorney and decided to revoke the charitable trust. She then obtained counsel and filed a petition to revoke the charitable trust. After a hearing, Judge Kenneth Neill granted her petition.

4

¶12 Kloss then filed this complaint in the District Court for the Eighth Judicial District in Cascade County on December 28, 1998. Kloss alleged that Jones violated Montana statutes regarding the sale of securities, was negligent, committed unfair and deceptive business practices, breached its fiduciary obligations, and committed fraud. Kloss sought attorney fees, costs, expenses, and taxes incurred from the creation and revocation of the charitable trust. Jones filed a Motion to Compel Arbitration and Stay Proceedings on February 17, 1999. Evidentiary hearings were held on October 27, 1999, and February 1, 2000.

¶13 On June 12, 2000, the Honorable Marge Johnson entered an Order granting Jones' Motion to Compel Arbitration and Stay Proceedings, in spite of her finding that Kloss had not been provided with a copy of the 1992 Agreement. The 1998 Agreement was not discussed in Judge Johnson's decision.

¶14 On July 6, 2000, Kloss appealed to the Montana Supreme Court and filed her initial brief. During the course of the appeal, however, Jones located the detached signature card that acknowledged Kloss' receipt of the 1998 Agreement. Jones requested that the appeal be stayed so that the District Court could make supplemental findings of fact and conclusions of law based on the 1998 Agreement rather than the 1992 Agreement which was the subject of Judge Johnson's Order.

¶15 On January 9, 2001, we remanded this case to the District Court for supplemental findings of fact and conclusions of law based on the 1998 Agreement. We additionally remanded Kloss' Motion for Attorney's Fees and Costs.

5

¶16 The District Court, the Honorable Julie Macek presiding, held an evidentiary hearing on March 20, 2001. On March 26, 2001, the District Court issued an order which granted the Defendant's Motion to Stay Proceedings and Compel Arbitration. On May 7, 2001, the District Court issued an order denying Kloss' Motion for Attorney's Fees and Costs. Kloss now appeals from these orders. We affirm in part and reverse in part the orders of the District Court.

## DISCUSSION

## ISSUE 1

¶17 Did the District Court err when it concluded that the arbitration clauses contained in the 1992 and 1998 Full Service Agreements were enforceable?

¶18 Both district judges concluded, based on slightly different reasoning, that the identical arbitration clauses found in the 1992 and 1998 contracts were binding and should be enforced. Before we can review the correctness of those conclusions, it is necessary to set forth the findings made by each district judge. Those findings are not challenged on appeal and are, therefore, assumed to be the determinative facts on which our opinion is based. Judge Johnson made the following relevant findings:

> 7. The Full Service Agreement was drafted by Edward Jones, and printed on an Edward Jones form. The document at issue is a form dated 12/91.
>
> 8. Clients do not have any input on the contents of the agreement. It is presented to them as is for their signature and they must sign the agreement as is if they wish to open an account with the Defendants.
>
> 9. While there are certainly other investment brokers in Great Falls, no evidence was presented which would lead me to believe Mrs. Kloss had any

6

meaningful choice in accepting or rejecting an arbitration provision of such a contract or that other stockbrokers offered contracts at that time for similar accounts which did not contain an arbitration provision. I have no reason to believe that was not a fairly standard practice at that time, and that she had no meaningful choice regarding acceptance of the agreement if she wished to open an investment account, which is what I do believe and find as a fact.

10. The arbitration provision is a unilateral provision of the brokerage houses contained in a contract presented to clients as is with no meaningful opportunity to negotiate its presence in the contract . . . . It is reasonable to assume that such contracts commonly contain such a provision today, regardless of the brokerage house with which a client is dealing.

. . . .

12. Mrs. Kloss liked and trusted Mr. Husted and expected that he would explain to her anything she needed to know that was significant.

13. She did have an opportunity to read the agreement before she signed it, and was capable of doing so, but did not do so, relying instead upon Mr. Husted to advise her of the significant features of the agreement.

14. Mr. Husted, in opening accounts, such as that which Mrs. Kloss opened with him in 1992, explains what he believes to be the significant features from an investment perspective, . . . .

15. Mr. Husted did not consider the arbitration provision to be a significant provision of the contract.

. . . .

17. He [Husted] does not routinely explain and did not explain to Mrs. Kloss the arbitration provision of the contract.

18. She did not read and was not aware of the arbitration provision of the contract.

¶19 Judge Macek made the following findings which are relevant to our decision:

22. The Full Service Agreement [1998 Agreement] was drafted by and printed on an Edward D. Jones form.

7

23. Clients do not have input on the contents of said form. If clients wish to open a full service account with Defendant they must sign the agreement.

24. Kloss had the opportunity to read the terms of the agreement before she signed it. Kloss did not do so.

25. Husted's normal procedure in opening accounts, which he followed with Kloss, is to explain what he believes to be the significant features of the account from an investment perspective, . . . .

26. Husted did not consider the arbitration provision to be a significant provision of the contract.

. . . .

28. Husted does not routinely explain the arbitration provision to clients and did not explain it to Kloss.

. . . .

36. Edward D. Jones & Co. is engaged in interstate commerce.

¶20 In spite of what she found to be the facts, Judge Johnson concluded, based on our decision in *Chor v. Piper, Jaffray & Hopwood, Inc.* (1993), 261 Mont. 143, 862 P.2d 26, that Jones had no obligation to explain to Kloss the terms of its contract with her and that even if the contract in question was a contract of adhesion, it was not unenforceable because it was not unconscionable based on the criteria set forth in *Iwen v. U.S. West Direct*, 1999 MT 63, 293 Mont. 512, 977 P.2d 989. Judge Johnson did not draw any conclusion or make any finding as to whether the arbitration provision was within Kloss' reasonable expectations.

¶21 Following her findings, Judge Macek concluded that Jones had no duty to explain the terms of the contract based on our decision in *Chor* and that Kloss is presumed to have read and understood the terms of the contract. Judge Macek also concluded that the agreements

8

in question were not contracts of adhesion because Kloss could have done business with other brokerage houses (Macek made no finding to contradict Johnson's finding that the agreements at other brokerage houses would also have included an arbitration provision) and, finally, Judge Macek concluded that even if the agreements in question were contracts of adhesion, they were not unenforceable because they were within Kloss' reasonable expectations and were not unconscionable pursuant to our decision in *Iwen*. Judge Macek concluded that the arbitration provisions were within Kloss' reasonable expectations because they were included within the agreements.

¶22 On appeal, Kloss argues that the arbitration clause was part of a contract of adhesion and that waiver of her constitutional right to jury trial should not be presumed from signing a contract of adhesion. Jones contends that form contracts between securities brokers and their clients are not contracts of adhesion, nor are the arbitration clauses contained in such contracts unconscionable.

¶23 In *Iwen*, we were presented with the issue of whether an arbitration provision in an advertiser's yellow page directory agreement was enforceable and barred the advertiser's direct action in district court. We concluded first of all that a district court's order compelling arbitration is subject to *de novo* review. *Iwen*, ¶ 17 (*citing Zolezzi v. Dean Witter Reynolds, Inc.* (9th Cir. 1986), 789 F.2d 1447). We acknowledged that pursuant to the Federal Arbitration Act, found at 9 U.S.C. §§ 1-16 (1998), arbitration provisions found in contracts affecting interstate commerce are valid "save upon such grounds as exist at law or in equity for the revocation of any contract." *See* 9 U.S.C. § 2 (1998) *and Iwen*, ¶ 23. We also noted

9

that while generally applicable contract law defenses may be used to set aside arbitration agreements, states may not craft special rules which only apply to arbitration provisions for the purpose of defeating arbitration. *Iwen*, ¶ 26. Finally, we stated that a generally applicable contract law defense arises in contracts of adhesion which will not be enforced against the weaker party when it is: (1) not within the reasonable expectations of said party, or (2) within the reasonable expectations of the party, but, when considered in its context, is unduly oppressive, unconscionable or against public policy. *Iwen*, ¶ 27. We ultimately concluded that the arbitration provision at issue in *Iwen* was unconscionable because it lacked mutuality. In other words, U.S. West retained the right to proceed in district court while Iwen was precluded from doing so.

¶24   A contract of adhesion is a contract whose terms are dictated by one contracting party to another who has no voice in its formulation. Corbin on Contracts, § 1.4 at 13 (1993). The law pertaining to contracts of adhesion is not merely an academic exercise in which we engage to resolve contract disputes. It is a recognition of the reality that contracts do not always reflect terms that were bargained for at arms length. Instead, terms are sometimes dictated by one party to another who has no bargaining power and no realistic options. The law pertaining to contracts of adhesion recognizes that in certain circumstances, traditional assumptions associated with contract law are unfounded. However, determining that a contract is a contract of adhesion is not the end of the inquiry in Montana. In *Passage v. Prudential-Bache Securities, Inc.* (1986), 223 Mont. 60, 727 P.2d 1298, we described

10

contracts of adhesion in the securities context and the circumstances under which they are unenforceable.

> Contracts of adhesion arise when a standardized form of agreement, usually drafted by the party having superior bargaining power, is presented to a party, whose choice is either to accept or reject the contract without the opportunity to negotiate its terms. Here, the investor is faced with an industry wide practice of including Arbitration Clauses in standardized brokerage contracts. As the investor faces the possibility of being excluded from the securities market unless he accepts a contract with such an agreement to arbitrate, such clauses come within the adhesion doctrine. However, mere inequality in bargaining power does not render a contract unenforceable, nor are all standardized contracts unenforceable. As a consequence of current commercial realities, form forum clauses will control, absent a strong showing it should be set aside. For such a contract or clause to be void, it must fall within judicially imposed limits of enforcement. It will not be enforced against the weaker party when it is : (1) not within the reasonable expectations of said party or (2) within the reasonable expectations of the party, but, when considered in its context, is unduly oppressive, unconscionable, or against public policy. [Citations omitted.]

*Passage*, 223 Mont. at 66, 727 P.2d at 1301-02 (*quoting Finkle and Ross v. A.G. Becker Paribas, Inc.* (D.C.N.Y. 1985), 622 F.Supp. 1505, 1511-12).

¶25 We enforced the arbitration agreements in *Passage* because there was no evidence that they were not within the parties' reasonable expectation nor was there evidence that they were unconscionable.

¶26 In *Chor*, we were again called on to decide whether arbitration provisions in securities agreements were contracts of adhesion and, if so, whether the arbitration clause is unconscionable. We concluded that the arbitration agreement was not a contract of adhesion because the consumer had testified that she had brokerage agreements with other firms which did not require her to arbitrate future disputes. We also held that the arbitration provision

11

was clearly within Chor's reasonable expectations based on her own testimony that she understood her obligation to arbitrate based on her review of the agreement. Finally, we concluded that the broker in that case had no obligation to explain the effect of the arbitration clause because a fiduciary duty had not been established. We held that:

> In the absence of discretionary authority by a stockbroker to buy and sell in a customer's account, no fiduciary relationship is created in a broker-customer relationship. *Caravan Mobile Home Sales v. Lehman Bros. Kuhn Loeb* (9th Cir. 1985), 769 F.2d 561, 567.

*Chor*, 261 Mont. at 153, 862 P.2d at 32.

¶27 We conclude that both *Passage* and *Chor* are distinguishable, based on their facts, from this case. First, based on Judge Johnson's findings which are neither appealed nor contradicted by Judge Macek's findings, Kloss' agreements with Jones are clearly contracts of adhesion. They were standardized forms prepared by Jones and presented to Kloss who had no opportunity to negotiate the terms of the contracts if she chose to invest through Jones. Furthermore, the arbitration clause was found by Judge Johnson to be an industry-wide practice. Kloss would have been excluded from the securities market unless she accepted the agreement to arbitrate.

¶28 Furthermore, unlike the facts in *Passage* and *Chor*, the District Court's findings clearly establish that the arbitration provision by which Kloss waived her right of access to this State's courts, her right to a jury trial, her right to reasonable discovery, her right to findings of fact based on the evidence, and her right to enforce the law applicable to her case by way of appeal were clearly not within Kloss' reasonable expectations. Kloss relied on

12

Husted to explain to her anything in the contract that was significant. Husted, in fact, admitted that his normal practice when opening accounts was to explain significant features of the account to the investor. However, he did not explain the arbitration provision (a provision by which Kloss waived at least two constitutional rights, i.e., a right of access to the courts pursuant to Article II, Section 16, and her right to a jury trial pursuant to Article II, Section 26 of the Montana Constitution) to Kloss. Finally, based on the routine practice between the parties, Kloss did not read the contract and was not aware of the arbitration provision in the contract.

¶29 Judge Macek's conclusion that the arbitration provision was within Kloss' reasonable expectation simply because it was contained in the contract that she signed would defeat the protections provided by principles of law pertaining to contracts of adhesion. If the only question was whether the written terms of a contract included the challenged provision, reasonable expectations would never become an issue. Contracts of adhesion would always be enforced based on their plain language without regard to what the consumer knew or understood. However, that is not the law pertaining to contracts of adhesion as previously set forth in our prior decisions which apply to any contract.

¶30 We have also been asked to conclude on appeal that the arbitration provisions found in Kloss' agreements with Jones are unconscionable. However, having concluded that the agreements were not within Jones' reasonable expectations, we need not reach the issue of conscionability. Furthermore, as a guide to future litigants who raise the issue of conscionability in the context of arbitration provisions, we take this opportunity to state that

13

that issue cannot be decided without a more fully developed record. We have set forth the factors to be considered in *Iwen*, however, a number of factual issues should be addressed before those factors can be appropriately applied. For example:

1. Are potential arbitrators disproportionately employed in one or the other party's field of business?

2. Do arbitrators tend to favor "repeat players" as opposed to workers or consumers who are unlikely to be involved in arbitration again? In other words, is there a tendency by arbitrators to avoid decisions which will result in the loss of future contracts for their services?

3. What are the filing fees for arbitration compared to the filing fees in Montana's district courts?

4. What are arbitrators' fees? Do they make small claims prohibitive? Do they discriminate against consumers or workers of modest means?

5. Are arbitration proceedings shrouded in secrecy so as to conceal illegal, oppressive or wrongful business practices?

6. To what extent are arbitrators bound by the law?

7. To what extent are arbitrators bound by the facts?

8. What opportunity do claimants have to discover the facts necessary to prove a claim such as a company's business practices?

¶31 These are all issues which we consider relevant to the ultimate issue of whether an arbitration provision in a contract of adhesion is oppressive or unconscionable. Therefore,

14

we would advise future claimants not to come to this Court with claims of oppression or unconscionability unless the record in regard to these issues has been adequately developed.

¶32   For these reasons we conclude, based on generally applicable contract law defenses, that the District Court erred when it concluded that the arbitration clauses contained in the 1992 and 1998 Full Service agreements were enforceable.

## ISSUE 2

¶33   Did the District Court err when it failed to consider whether Defendants owed Kloss a fiduciary duty to explain the arbitration agreement?

¶34   Kloss contends that the District Court erred when it found that the parties were dealing at arms length and that the Defendants consequently had no obligation to explain the arbitration provision.  According to Kloss, Husted had a fiduciary relationship with Kloss because he had the discretion to trade securities in her account.  The Defendants argue that Husted did not have the discretion to trade in Kloss' account and that Kloss misreads the provision which she claims gave Husted discretionary authority.

¶35   Whether Kloss and Husted, as broker and client, enjoyed a fiduciary relationship is highly fact intensive.  "The question is not whether there is a fiduciary duty, which there is in every broker-customer relationship; rather, it is the scope or extent of the fiduciary obligation, which depends on the facts of the case." *Duffy v. Cavalier* (1989), 215 Cal. App. 3d 1517, 1535, 264 Cal.Rptr. 740, 752.  In *Chor*, we held that although § 30-10-301(1), MCA, may create an implied code of conduct for brokers, a violation of which may constitute a breach of the duty the broker owes to a client, that duty is not necessarily

15

fiduciary in nature. "In the absence of discretionary authority by a stockbroker to buy and sell in a customer's account, no fiduciary relationship is created in a broker-customer relationship." *Chor*, 261 Mont. at 153, 862 P.2d at 32. Therefore, pursuant to our analysis in *Chor*, a fiduciary relationship is created whenever a broker has discretion to buy and sell in the client's account.

¶36 Here, Jones and Husted had discretion to buy and sell securities in Kloss' account pursuant to the 1992 Agreement. Specifically, the "Liquidation of Collateral or Account" section of the Agreement states:

> You may sell any or all property held in any of my accounts and cancel any open orders for the purchase or sale of any property without notice, in the event of my death or whenever in your discretion you consider it necessary for your protection.

Furthermore, Kloss testified that Husted exercised that discretion when he selected and sold securities from her account to fund the newly created charitable trust without consulting her regarding which securities to sell.

¶37 Therefore, based on the plain language of the Agreement and Husted's selection and sale of securities in Kloss' account, we conclude that Kloss and Husted had a fiduciary relationship. In the words of Chief Judge Cardozo of the Court of Appeals of New York, a fiduciary duty is "the duty of the finest loyalty" and encompasses "[n]ot honesty alone, but the punctilio of an honor the most sensitive." *Meinhard v. Salmon* (1928), 249 N.Y. 458, 463-64, 164 N.E. 545, 546. In light of the substantial fiduciary obligations owed to his client, Husted should have explained the arbitration clause, a clause which effectively waived

16

the constitutional rights of a 95 year old widow with no bargaining power and a relative lack of sophistication in such matters. However, as the District Court found, Husted did not consider the arbitration provision to be a significant provision of the contract and therefore did not explain the arbitration provision to Kloss. The irony of the Defendants' position is not lost on this Court, as the supposedly insignificant arbitration provision they now seek to enforce to the detriment of Kloss' constitutionally protected rights of access to court and trial by jury is now squarely at the center of this appeal.

¶38 We hold that Husted owed Kloss a fiduciary duty which included explaining the consequences of the arbitration provision Jones now seeks to enforce. Accordingly, we conclude that the District Court erred when it failed to consider whether a fiduciary duty existed.

## ISSUE 3

¶39 Did the District Court err when it denied Kloss' motion for attorney's fees and costs?

¶40 Kloss contends that the District Court erred when it denied the claim for the opportunity to conduct discovery in an effort to prove that Kloss was entitled to attorney fees based on Jones' untimely disclosure of the detachable signature card. That issue was remanded to the District Court, which according to Kloss, should have made the determination of whether she was entitled to attorney fees.

¶41 Jones responds that the District Court did not err when it denied discovery on the attorney fee issue after reading the entire file, including prior transcripts and court orders.

17

Jones contends that the District Court had the discretion to conclude that further evidence of the issue of attorney fees was unnecessary.

¶42 Attorney fees and costs may be awarded when:

> An attorney or party to any court proceeding who, in the determination of the court, multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney fees reasonably incurred because of such conduct.

§ 37-61-421, MCA.

¶43 In its May 7, 2001, Order, the District Court found that the Defendants did not unreasonably or vexatiously multiply the proceedings. After reviewing the record, we conclude that the District Court's finding was not clearly erroneous. Consequently, we affirm the District Court's order denying the motion for attorney fees and costs.

¶44 This case is remanded to the District Court for further proceedings consistent with this opinion.

_____
                    Justice

We Concur:

_____

_____

_____

_____
Justices

18

Justice W. William Leaphart specially concurring.

¶45 I concur in the decision of the Court. I write separately to point out an additional fact that I find significant in determining whether or not the waivers inherent in the arbitration agreement were within Alice Kloss's reasonable expectations.

¶46 The Court notes that the 1998 Agreement contained a pre-dispute arbitration clause which was not signed by Kloss. Rather, Kloss signed a detachable signature card that acknowledged she received a copy of the 1998 Agreement and incorporated the Agreement's arbitration clause by reference. I would also add that the record indicates that the detachable signature card was signed by Kloss before she was ever provided a copy of the Agreement. The branch office administrator, Donna Ferderer, testified that she filled out the Jones account number, wrote Kloss's social security number on the form, wrote the type of registration of the account, and tore the detachable card out of the brochure. Ferderer testified that, "I gave it to Alice and told Alice I need her signature right here. And for her to please indicate her capacity." Ferderer then took the form back, gave Kloss the disclosure statement, advised her that "these are the terms and conditions of opening up an Edward D. Jones account, keep these for your records. We retain this copy for our home office."

¶47 Although the detachable signature card states that the Agreement "contains a pre-dispute arbitration clause," it does not advise Kloss that in submitting to arbitration she waives her right to access to the courts, her right to jury trial, her right to reasonable discovery, her right to findings of fact based on the evidence and her right to enforce the law

19

applicable to her case by way of appeal. Unless, in advance of executing the signature card, Kloss was advised of the fact that an agreement to arbitrate effectively waived the above rights, it cannot be said that such waivers were within her reasonable expectations when she signed. Reasonable expectations are, by their very nature, prospective; they are defined *before* one enters into a contract, not after. Thus the terms and conditions governing the account should have been provided to or explained to Kloss before having her execute the signature card. Recognizing the routine practice between the parties, the Court notes that Kloss did not read the contract. However, even if she had read the Agreement, it would not have made any difference since it was not handed to her until after she signed the detachable card.

_W. William Leaphart_
Justice

Justice Jim Rice joins in the concurring opinion of Justice Leaphart.

_Jim Rice_
Justice

Justice James C. Nelson specially concurs.

¶48  I concur in our Opinion. However, as mentioned briefly at ¶¶ 21, 27 and 36 of our Opinion and at ¶ 47 of Justice Leaphart's concurrence, there is an additional rationale supporting our decision in this case--i.e., whether Kloss effectively waived her rights to a trial by jury and to access to the courts[1] by executing Jones's 1992 and 1998 standard-form contracts.  As far as I can determine, this is an issue of first impression in Montana.[2]  It is my intention to develop this rationale further.

¶49  Certainly, any person has the right to enter into an agreement which includes an arbitration clause.  Where the contract and the arbitration clause has been negotiated at arm's- length between parties of equivalent sophistication and bargaining power, then there

---

[1] I have limited my analysis and discussion to these two constitutional rights because these are the two raised in this case. In saying that, I recognize, however, that other constitutional rights may be implicated in these sorts of cases, including the right to due process of law (Article II, Section 17, Montana Constitution) and equal protection of the laws (Article II, Section 4, Montana Constitution).  Moreover, as our Opinion points out, arbitration results in the loss of certain procedural rights such as the right to engage in discovery and the right to have the admissibility of evidence judged under the Montana Rules of Evidence.  Additionally, the right to judicial review of arbitration decisions is severely restricted--i.e. effectively there is no right of appeal from these decisions.

[2] Jones relies on *Passage v. Prudential-Bache Sec., Inc.* (1986), 223 Mont. 60, 727 P.2d 1298; *Larsen v. Opie* (1989), 237 Mont. 108, 771 P.2d 977; *Kingston v. Ameritrade, Inc.*, 2000 MT 269, 302 Mont. 90, 12 P.3d 929; and *Southland v. Keating* (1984), 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1, in opposing Kloss's waiver argument.  As to this Court's opinions, while we upheld the arbitration agreements at issue in those cases on various grounds, we did not address the argument raised here--i.e. whether the rights to trial by jury and access to the courts under Article II, Section 26 and Article II, Section 16, may be forfeited by contractual waiver that is other than voluntary, knowing and intelligent. Similarly, the Supreme Court did not address the waiver of the Seventh Amendment right to jury trial in *Southland*.  In fact, the U.S. Supreme Court has not addressed this argument in the context of any arbitration case.

21

is no reason why such parties cannot also agree to settle disputes arising under the agreement, outside the judicial process. If these sorts of parties determine that it serves their mutual interests to waive their Montana constitutional rights of jury trial and access to the courts, then they have the right to do so.

¶50 The contrary is also true. Where parties are not of equivalent sophistication and bargaining power and where the agreement and the arbitration clause have not been negotiated for at arm's-length, then it is appropriate--indeed, imperative--that courts closely scrutinize any process and any contract which results in one party forfeiting basic constitutional guarantees to the advantage of the other party. That brings me to the case at bar.

¶51 As stated in our Opinion, the parties here were not of equivalent sophistication and bargaining power. The defendant, Jones, is one of this country's large financial corporations; Kloss is an elderly widow. Jones is in the business of selling securities and investment advice and services nation-wide; Kloss is an ordinary citizen with no apparent special expertise in the stock market. Kloss did not negotiate at arm's-length for the contracts at issue. Rather, she was presented with typical, standard-form, take-it-or-leave-it contracts of adhesion that, among other boiler-plate provisions, included arbitration clauses. Kloss did not read the agreements but relied upon Jones's agent, Husted, to explain the significant terms of the agreements to her, as he had in past dealings. Furthermore, as Justice Leaphart points out (and setting aside the question of whether Kloss would have understood the significance

of what she was agreeing to) even if she had desired to read the contracts before signing, Jones's execution procedures insured that she would not have that opportunity.

¶52 With that background, I next turn to Article II of Montana's Constitution. The rights included within this "Declaration of Rights" are "fundamental rights." *Butte Community Union v. Lewis* (1986), 219 Mont. 426, 430, 712 P.2d 1309, 1311. *Accord, Wadsworth v. State* (1996), 275 Mont. 287, 299, 911 P.2d 1165, 1172; *State v. Tapson*, 2001 MT 292, ¶ 15, 307 Mont. 428, ¶ 15, 41 P.3d 305, ¶ 15. That means that these rights are significant components of liberty, *see Black's Law Dictionary*, 7th Edition, p. 683, any infringement of which will trigger the highest level of scrutiny, and, thus, the highest level of protection by the courts. *Wadsworth*, 275 Mont. at 302, 911 P.2d at 1174 (*citing Gulbrandson v. Carey* (1995), 272 Mont. 494, 502, 901 P.2d 573, 579 ("The most stringent standard, strict scrutiny, is imposed when the action complained of interferes with the exercise of a fundamental right . . .")). Two specific fundamental rights are implicated here. The first involves the right to trial by jury.

¶53 Article II, Section 26 of Montana's Constitution guarantees that "[t]he right of trial by jury is secured to all and shall remain inviolate." That this constitutionally guaranteed right of a jury trial is "fundamental" and, therefore, deserving of the highest level of court scrutiny and protection is beyond argument. *See, e.g., State v. LaMere*, 2000 MT 45, 298 Mont. 358, 2 P.3d 204 (requiring procedural exactitude for impaneling jury); *Woirhaye v. Montana Fourth Judicial Dist. Court*, 1998 MT 320, 292 Mont. 185, 972 P.2d 800 (striking statute that limited

23

right to sequential jury trials as unconstitutional); *State v. Dahlin*, 1998 MT 113, 289 Mont. 182, 961 P.2d 1247 (requiring waiver of right to jury trial be evinced by written consent of both parties filed with the court in criminal proceedings); *Hammer v. Justice Court of Lewis and Clark County* (1986), 222 Mont. 35, 720 P.2d 281 (abolishing prepayment of fees for civil jury trial as obstructive).

¶54 As we observed in *LaMere*, the importance of the right of trial by jury derives from it having "developed in harmony with our basic concepts of a democratic society and a representative government." *LaMere*, ¶ 28 (citation omitted). "Since the time of the Magna Carta, 'trial by jury has been prized as a shield against oppression . . . [and] the approaches of arbitrary power.'" *LaMere*, ¶ 28 (citation omitted). This entitlement has been "long thought to be a safeguard against tyranny." *LaMere*, ¶ 28. The right to trial by jury is a "jealously protected safeguard against government oppression." *LaMere*, ¶ 29. And, "[t]he guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which the law should be enforced and justice administered." *LaMere*, ¶ 29 (citation omitted). Or, as Justice William Blackstone stated over two centuries ago,

> [This right] is a privilege of the highest and most beneficial nature and our most important guardian both of public and private liberty. Our liberties cannot but subsist so long as this palladium remains sacred and inviolate, not only from all open attacks, but also from all secret machinations which may sap and undermine it.

*Commentaries on the Laws of England* (1765), *reprinted in* Volume 2 of *In Defense of Trial by Jury* at ii (J. Kendall Few, American Jury Trial Foundation, 1993).

24

¶55 Given the sacredness and inviolability of the fundamental right to trial by jury, any contract provision that openly or subtly causes the forfeiture of the exercise of this right must be rigorously examined by the courts. This is all the more necessary when such a contract provision is included in a standard-form contract of adhesion foisted upon unsophisticated and unsuspecting ordinary citizens and small business people as part of the intercourse of daily life. Indeed, the use of such contractual provisions is at one and the same time an "open attack" on the right of jury trial and a "secret machination" causing forfeiture of that right that Blackstone predicted would "sap and undermine" the right, and with that our "public and private libert[ies]."

¶56 The second fundamental right at issue in the case at bar is the right of access to the courts.

¶57 Article II, Section 16 of Montana's Constitution guarantees that "[c]ourts of justice shall be open to every person, and speedy remedy afforded for every injury of person, property, or character." In my view, this right is as much a fundamental right as is any other Article II right. This is so not only because the right of access to the courts is included within the Constitution's Declaration of Rights, but also, and just as importantly, without the right of access to the courts, other Article II rights would have little protection from infringement and, thus, little meaning. *See, Butte Community Union*, 219 Mont. at 430, 712 P.2d at 1311-13; *Wadsworth*, 275 Mont. at 299, 911 P.2d at 1172.

¶58 Constitutional rights that cannot be enforced are illusory. It is as if those rights cease

to exist as legal rights. Montanans' fundamental rights to a jury trial, to due process and to equal protection, among others, are rendered meaningless absent the courts being able to enforce these rights. Purely and simply, access to the courts guarantees that other Article II rights are something more than mere dreams and aspirations. Access to the courts gives real existence to other fundamental rights. And, that makes access to the courts a fundamental right also, for without this right other rights have no meaning.

¶59    In this conclusion, I acknowledge that we have explicitly and implicitly held to the contrary. *See, Meech v. Hillhaven West Inc.* (1989), 238 Mont 21, 776 P.2d 488; *Peterson v. Great Falls School District* (1989), 237 Mont. 376, 773 P.2d 316; *Miller v. Fallon County* (1989), 240 Mont. 241, 783 P.2d 419; *Bieber v. Broadwater County* (1988), 232 Mont. 487, 759 P.2d 145; *Linder v. Smith* (1981), 193 Mont. 20, 629 P.2d 1187; *Merchants Ass'n v. Conger* (1979), 185 Mont. 552, 606 P.2d 125. Notwithstanding, I do not see how these decisions can be squared with, much less continue to exist beside, this Court's jurisprudence holding that other Article II rights are fundamental rights.

¶60    This Court has stated repeatedly that a right is fundamental under Montana's Constitution if the right is either found in the Declaration of Rights or is a right without which other constitutionally guaranteed rights would have little meaning. *State v. Bird*, 2001 MT 2, ¶ 25, 308 Mont. 75, ¶ 25, 43 P.3d 266, ¶ 25 (right to be present for all court proceedings); *In re Mental Health of K.G.F.*, 2001 MT 140, ¶ 30, 306 Mont. 1, ¶ 30, 29 P.3d 485, ¶ 30 (right to effective assistance of counsel for involuntary commitment proceedings);

26

*Armstrong v. State*, 1999 MT 261, ¶ 34, 296 Mont. 361, ¶ 34, 989 P.2d 364, ¶ 34 (right to privacy); and *MEIC v. Dept. of Environmental Quality*, 1999 MT 248, ¶ 56, 296 Mont. 207, ¶ 56, 988 P.2d 1236, ¶ 56 (right to a clean and healthful environment); *State v. Clark*, 1998 MT 221, ¶ 22, 290 Mont. 479, ¶ 22, 964 P.2d 766, ¶ 22 (right to confront and examine accusers); *State v. Weaver*, 1998 MT 167, ¶ 26, 290 Mont. 58, ¶ 26, 964 P.2d 713, ¶ 26 (right to a unanimous verdict); *Wadsworth*, 275 Mont. at 299, 911 P.2d at 1172 (right to pursue employment); *Matter of C.H.* (1984), 210 Mont. 184, 201, 683 P.2d 931, 940 (right to physical liberty). We could never have enforced the fundamental rights litigated in these and in other cases where fundamental rights were at issue had access to the courts been denied in the first instance. Indeed, without access to the courts, these other fundamental rights would have had no real existence; they would have been merely aspirations without substance.

¶61 The instant case and others we have considered--*Chor*, 261 Mont. 143, 862 P.2d 26; *Casarotto*, 268 Mont. 369, 886 P.2d 931; *Keystone, Inc. v. Triad Systems Corporation*, 1998 MT 326, 292 Mont 229, 971 P.2d 1240; and *Iwen*, 1999 MT 63, 293 Mont. 512, 977 P.2d 989--likewise demonstrate why the right of access to the courts must be protected as the fundamental constitutional right it is. These cases point inescapably to the conclusion that, for their own obvious economic benefit, large national and multi-national corporations are effectively privatizing an important segment of the civil justice system in this country by including fine-print, non-negotiable, take-it-or-leave-it, mandatory, binding arbitration

27

clauses in their standard-form contracts.[3]

¶62    These are the adhesion contracts that ordinary citizens and small business people must accept if they want to acquire what most would consider to be basic and necessary services and products--household appliances, residential leases, rental cars, pest extermination, banking services, office and business equipment, phone service, consumer product warranties, household and commercial insurance, employment, credit cards, consumer and small business financing and medical attention, for example.   Likewise, these are the

---

[3] A cursory review of the literature will reveal not only the substantial and growing support for my conclusion but also will provide citations to a multitude of cases which detail the horror stories of corporate abuse of ordinary citizens and small business people by way of the inclusion of mandatory arbitration clauses in contracts of adhesion. *See, e.g.*, Jean R. Sternlight, *Mandatory Binding Arbitration and the Demise of the Seventh Amendment Right to a Jury Trial* (2001), 16 Ohio St. J. on Disp. Resol. 669; Margaret M. Harding, *The Redefinition of Arbitration by Those with Superior Bargaining Power* (1999), 1999 Utah L. Rev. 857; Katherine Van Wezel Stone, *Rustic Justice: Community and Coercion Under the Federal Arbitration Act*, 77 N.C. L. Rev. 931 (1999); Reginald Alleyne, *Statutory Discrimination Claims: Right "Waived" and Lost in the Arbitration Forum* (1996), 13 Hofstra Lab. L.J. 381, to name just a few.

That said, there is also little point railing against the present state of the law "favoring" arbitration. *See, Moses H. Cone Memorial Hosp. v. Mercury Const.Corp.* (1983), 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765. I will note, however, that arbitration, historically, was designed as a method of alternative dispute resolution between merchants of equal sophistication and bargaining power (*see* Jerold S. Auerbach, *Justice Without Law?* 101-114 (1983); Ian R. MacNeil, *American Arbitration Law* 15-25 (1992)); that during the deliberations leading up to the passage of the Federal Arbitration Act (FAA), the proponents, drafters and sponsors--Senator Walsh from Montana, among others--were extremely concerned that the inclusion of arbitration clauses in adhesion contracts be voluntary because of the concomitant loss of the right of jury trial and court access (*see,* the excellent discussion of this point in *Allstar Homes, Inc. v. Waters* (1997, Ala.), 711 So.2d 924 (Cook, J. concurring); and that, with due all deference to the Supreme Court of the United States, Justices Thomas's and Scalia's criticism of *Southland* and its progeny and their conclusion that these cases should be overruled to the extent that they apply the FAA in state court proceedings is dead right. *See, Allied-Bruce Terminix Companies v. Dobson* (1995), 513 U.S. 265, 283, 115 S.Ct. 834, 844, 130 L.Ed.2d 753 (Scalia, J. and Thomas, J., dissenting).

adhesion contracts that, as in the case *sub judice*, ordinary citizens and small business people are compelled to sign if they want to participate in the national/global economy, the profits of which fuel the very existence and growth of these same national and multi-national corporations (and the election and re-election of their benefactors in government). Bankruptcy Judge James S. Sledge, Jr. recently brought this point home. He observed:

> Ask any reasonable man on the street, i.e.[,] a consumer, if he thinks it is fair that he is barred from access to the courts when he has a claim based on a form contract which contains an arbitration clause and he will respond with a resounding "No!" . . . The reality that the average consumer frequently loses his/her constitutional rights and right of access to the court when he/she buys a car, a household appliance, insurance policy, receives medical attention or gets a job rises as a putrid odor which is overwhelming the body politic.

*In re Knepp*, 229 B.R. 821, 827 (Bankr. N.D. Ala. 1999).

¶63 In short, without access to the courts, there is no way to safeguard the other fundamental rights guaranteed by Article II of Montana's Constitution. Indeed, to the extent that those rights cannot be protected by the courts, Montana's Declaration of Rights is little more than a collection of eloquent, but unenforceable, words. Access to the courts is a fundamental right, and our cases that hold to the contrary are wrong.

¶64 That said, my objective here is not to provide an analysis for challenging the reasoning of *Meech, Linder* and their progeny. Rather, my point is that where fundamental constitutional rights are involved--here, the right of a trial by jury and, in my opinion, access to the courts--the law is eminently clear that the waiver of such rights will not be lightly presumed. *State v. Okland* (1997), 283 Mont. 10, 15, 941 P.2d 431, 434 (presuming waiver

29

of counsel from a silent record is impermissible); *State v. Lucero* (1968), 151 Mont. 531, 538, 445 P.2d 731, 735 (stating courts indulge every reasonable presumption against waiver of constitutional rights). A waiver of a fundamental right must be proved to have been made voluntarily, knowingly and intelligently--typically by the party seeking the waiver. *Bird,* ¶¶ 35-36; *Tapson,* ¶ 25; *Lucero,* 151 Mont. at 538, 445 P.2d at 735. For a fundamental right to be effectively waived, the individual must be informed of the consequences before personally consenting to the waiver. *Dahlin,* ¶ 22; *State v. Allison* (1944), 116 Mont 352, 360, 153 P.2d 141, 145. And, the waiver will be narrowly construed. *State v. Tiedemann* (1978), 178 Mont. 394, 402, 584 P.2d, 1284, 1298.

¶65 In applying these well-settled principles of law in the context of the issue presented here, a reviewing court must consider a totality of overlapping and non-exclusive factors including: whether there were any actual negotiations over the waiver provision; whether the clause was included on a take-it-or-leave-it basis as part of a standard-form contract; whether the waiver clause was conspicuous and explained the consequences of the provision (e.g. waiver of the right to trial by jury and right of access to the courts); whether there was disparity in the bargaining power of the contracting parties; whether there was a difference in business experience and sophistication of the parties; whether the party charged with the waiver was represented by counsel at the time the agreement was executed; whether economic, social or practical duress compelled a party to execute the contract (e.g. where a consumer needs phone service and the only company or companies providing that service

30

require execution of an adhesion contract with a binding arbitration clause before service will be extended); whether the agreement was actually signed or the waiver provision separately initialed; whether the waiver clause was ambiguous or misleading; and whether the party with the superior bargaining power lulled the inferior party into a belief that the waiver would not be enforced.

¶66 Returning to the record before us, there is no evidence to support a conclusion that Kloss knowingly and intelligently waived her rights to trial by jury and access to the courts when she executed Jones's standard-form contracts containing the arbitration clauses. There is no evidence that Kloss negotiated for any provision in the contracts much less the arbitration clauses. There is no indication in the record that Kloss had counsel when she signed the agreements. And, it can hardly be argued that Kloss was on the same level of sophistication and expertise as that of Jones's agent, Husted; nor did she have any degree of equal bargaining power.

¶67 What the record does demonstrate, however, is that Kloss is an ordinary citizen of advanced years; that she did not read the agreements; that she was not given the opportunity to read the agreements (which, however, did contain an explanation of the consequences of the arbitration clause); and that Jones's agent, upon whom Kloss had historically relied to explain the significant parts of agreements presented to her, neither pointed out the existence of the arbitration clauses nor explained that the clauses would bar her from exercising her fundamental constitutional rights of access to Montana's courts and to a trial by jury. The

31

record is clear. Kloss did not voluntarily, knowingly and intelligently waive her fundamental constitutional rights of trial by jury and access to the courts on the facts presented here.

¶68    It is to the consequences of this ineffective waiver that I next turn.

¶69    The United States Supreme Court has held that the Federal Arbitration Act (FAA) preempts those state laws which invalidate and are "applicable *only* to arbitration provisions." *Allied-Bruce Terminix Companies v. Dobson* (1995), 513 U.S. 265, 281, 115 S.Ct. 834, 843, 130 L.Ed.2d 753. The Court has stated that in adopting Section 2 of the FAA Congress precluded states from singling out arbitration provisions for suspect status. Rather, according to the Court, such provisions must be placed "upon the same footing as other contracts." *Scherk v. Alberto-Culver Co.* (1974), 417 U.S. 506, 511, 94 S.Ct. 2449, 2453, 41 L.Ed.2d 270.

¶70    The Supreme Court has also held, however, that if a state law governs issues concerning the validity, revocability and enforceability of contracts in general--*see, Perry v. Thomas* (1987), 482 U.S. 483, 492, n. 9, 107 S.Ct. 2520, 2527, n. 9, 96 L.Ed.2d 426--then generally applicable contract defenses, such as fraud, duress or unconscionability, may be applied to invalidate arbitration agreements without contravening Section 2 of the FAA. *Doctor's Associates Inc., v. Casarotto* (1996), 517 U.S. 681, 687, 116 S.Ct. 1652, 1657, 134 L.Ed.2d 902 (*citing Allied Bruce*, 513 U.S. at 281, 115 S.Ct. at 843; *Rodriguez de Quijas v. Shearson/American Express, Inc.* (1989), 490 U.S. 477, 483-84, 109 S.Ct. 1917, 1921-22, 104 L.Ed. 2d 526; *Shearson/American Express, Inc., v. McMahon* (1987), 482 U.S. 220, 226,

32

107 S.Ct. 2332, 2337, 96 L.Ed 2d 195).

¶71   In this regard Montana has long subscribed to the rule that contractual waivers of constitutional rights must be evaluated in that light and by the tests applicable to the waiver of constitutional rights. *May v. Figgins* (1980), 186 Mont. 383, 394, 607 P.2d 1132, 1138. In *May*, we recognized the general rule that parties could contract in advance to submit to *in personam* jurisdiction of a given court--there, Colorado.  Nonetheless, we refused to uphold that sort of contract provision where the Colorado court was unable to exercise *in personam* jurisdiction consistent with due process.  We reasoned that the contract provision amounted to a forfeiture of the constitutional right of due process, and that there was  no "clear waiver" because the party charged with the waiver could not have known that the agreement he signed subjected him to the jurisdiction of the Colorado courts. In reaching this conclusion we pointed out that there was nothing in the agreement that specified the jurisdiction as to which the charged party waived his constitutional due process rights. *May*, 186 Mont. at 394, 607 P.2d at 1138 (*citing Fuentes v. Shevin* (1972), 407 U.S . 67, 95, 92 S.Ct. 1983, 2001, 32 L.Ed.2d 556 (The right of jury trial is fundamental and courts indulge every reasonable presumption against waiver.)).

¶72   Quoting *Telephonic, Inc. v. Rosenblum* (1975), 88 N.M. 532, 543 P.2d 825, 830, we observed that, " '[a]n agreement to waive this constitutional right must be deliberately and understandingly made, and the language relied upon to constitute such a waiver must clearly, unequivocally and unambiguously express a waiver of this right.' " *May*, 186 Mont. at 394,

33

607 P.2d at 1138-39. We then went on to state that:

> To accept the respondent's argument that the defendant here contractually consented to be sued in Colorado would be to give the respondent carte blanche to use contracts of adhesion to establish a right to sue defendants wherever would be most convenient to respondents, and least convenient to defendants. The contractual provisions purporting to waive in personam jurisdiction are unreasonable and unenforceable.

*May*, 186 Mont. at 395, 607 P.2d at 1139.

¶73 Similarly, but with a contrary result, we upheld a provision whereby a party contracted away his right to the statutory exoneration of his suretyship because the waiver of rights did not involve "a constitutional right, nor a waiver in violation of public policy." *Montana Bank of Circle, N.A., v. Ralph Meyers & Son, Inc.* (1989), 236 Mont. 236, 241, 769 P.2d 1208, 1212.

¶74 As discussed above, Montana law generally applicable to the waiver of constitutional rights, requires that the waiver will not be lightly presumed; that it must be proved to have been made voluntarily, knowingly and intelligently--typically by the party seeking the waiver; and that it will be narrowly construed. *See* ¶ 64 infra. Importantly, Montana applies these same principles in cases where there is a purported contractual waiver of constitutional rights. Such a contractual waiver " 'must be deliberately and understandingly made, and the language relied upon to constitute such a waiver must clearly, unequivocally and unambiguously express a waiver of this right.' " *May*, 186 Mont. at 394, 607 P.2d at 1138-39.

¶75 In this case, as already noted, there is no evidence in the record before us that Kloss

34

voluntarily, knowingly and intelligently waived her fundamental constitutional rights to a jury trial and to access to the courts when she signed Jones's standard-form contracts. Rather, the record demonstrates the contrary. Thus, Kloss's purported waiver of her rights to a jury trial and of access to the courts was not an effective waiver in a constitutional sense.

¶76 That being the case, and under principles of Montana law generally applicable to all contracts, Kloss's contract with Jones cannot be enforced, at least to the extent of the arbitration clause.

¶77 Accordingly, for the reasons set forth in our Opinion and in this separate Opinion, I concur.

_____
Justice

Justices Terry N. Trieweiler, W. William Leaphart and Patricia O. Cotter join in the foregoing concurrence.

_____

_____

_____
Justices

35