FILED

03/25/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 18-0661

DA 18-0661

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 69

AGUSTIN RAMON,

       Plaintiff and Appellant,

   v.

DARREN SHORT, in his official capacity as
Sheriff of Lincoln County and Administrator of
Lincoln County Detention Center,

       Defendant and Appellee.

APPEAL FROM:    District Court of the Nineteenth Judicial District,
In and For the County of Lincoln, Cause No. DV-18-218
Honorable Matthew J. Cuffe, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Alex Rate (argued), Elizabeth K. Ehret, ACLU of Montana,
Missoula, Montana

              Shahid Haque, Border Crossing Law Firm, Helena, Montana

              Cody Wofsy, Spencer Amdur, ACLU Foundation, Immigrants' Rights
Project, San Francisco, California

              Omar C. Jadwat, Daniel Galindo (argued), ACLU Foundation,
Immigrants' Rights Project, New York, New York

       For Appellee:

              Maureen H. Lennon (argued), MACo Defense Services, Helena, Montana

       For Amicus Curiae Scholars:

              James H. Goetz, Jeff Tierney, Goetz, Baldwin & Geddes, P.C.,
Bozeman, Montana

For Amicus Curiae Montana Association of Criminal Defense Lawyers:

Colin M. Stephens, Smith & Stephens, P.C., Missoula, Montana

Katherine Evans, University of Idaho College of Law, Moscow, Idaho

For Amicus Curiae United States:

Kurt G. Alme, United States Attorney, Chad C. Spraker, Assistant United States Attorney, Helena, Montana

Joseph P. Hunt, Assistant Attorney General, William C. Peachey, Director, Erez Reuveni, Assistant Director, Lauren Bingham, Senior Litigation Counsel, Francesca M. Genova (argued), Trial Attorney, U.S. Department of Justice, Washington, D.C.

Argued and Submitted:  January 8, 2020

Decided:  March 25, 2020

Filed:

_____
Clerk

2

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1　Appellant Agustin Ramon ("Ramon") appeals from a November 16, 2018 Nineteenth Judicial District Court, Lincoln County, order denying his application for temporary restraining order and preliminary injunction. In August 2018, Ramon was arrested on a charge of burglary and booked into the Lincoln County Detention Center ("Detention Center") in Libby, Montana. When Ramon attempted to post bond, the Detention Center informed the bond company that Lincoln County Sheriff Darren Short ("Sheriff")[1] would continue to detain Ramon, even if his bond were paid and he was otherwise entitled to release, since the U.S. Customs and Border Protection ("Border Patrol") had sent the Detention Center a civil immigration detainer request under the Immigration and Nationality Act.

¶2　We restate the following issues on appeal:

> *Issue One: Whether an exception to the mootness doctrine applies to a challenge to the lawfulness of a Montana law enforcement officer detaining an individual for a suspected violation of civil immigration law at the request of the federal government.*
>
> *Issue Two: Whether a Montana law enforcement officer carrying out a federal detainer constitutes an arrest under Montana law.*
>
> *Issue Three: Whether a Montana law enforcement officer has state law authority to conduct a civil immigration arrest in response to a federal detainer request.*

¶3　We affirm in part and reverse in part.

---

[1] At the time of the complaint, the Sheriff of Lincoln County was Roby Rowe. However, for the purposes of this Opinion we will maintain consistency and clarity by referring to the Sheriff of Lincoln County as Sheriff Short, Sheriff Rowe's successor.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 On August 3, 2018, Ramon was arrested on a charge of burglary and booked into the Lincoln County Detention Center. At the time of his arrest, Ramon lived in Eureka, Montana, with his wife. Ramon's bond was set at $25,000. The day Ramon was booked, the Detention Center received a Form I-247A detainer request from the Border Patrol, a division within the U.S. Department of Homeland Security ("DHS"), requesting the Detention Center detain Ramon for up to 48 hours after he was entitled to release on his state charges. The immigration detainer stated:

> DHS HAS DETERMINED PROBABLE CAUSE THE SUBJECT IS A REMOVABLE ALIEN. THIS DETERMINATION IS BASED ON [. . .] Statements made by the alien to an immigration officer and/or other reliable evidence that affirmatively indicates the alien either lacks immigration status or notwithstanding such status is removable under U.S. Immigration law. IT IS THEREFORE REQUESTED THAT YOU: maintain the custody of the alien for a period NOT TO EXCEED 48 HOURS beyond the time he/she would otherwise have been released from your custody.

¶5 Ramon's wife paid a bail bond company to post Ramon's bond. However, when the bondsman attempted to post Ramon's bond, Detention Center personnel told him that doing so would be futile as the Sheriff was granting Border Patrol's detainer request and that Ramon would not be released even if he posted bond. The Detention Center jail roster reflected as much, noting next to Ramon's name "can bond but do not release." Specifically, the statement, as explained by Detention Center staff, meant that Ramon could not be released to anyone except DHS personnel because a detainer request was issued. Under those circumstances, the bondsman declined to post Ramon's $25,000 bond since it would be futile.

¶6     Use of federal civil immigration detainers in Montana has increased in recent years. Since 2003, approximately 543 detainers have been issued to Montana detention facilities. During the years 2017, 2018, and 2019, there was a significant increase in detainers in Montana with a total of 190 issued, more than doubling the previous three years.[2]

¶7     As a result of Ramon's continued detention, Ramon filed a complaint on October 30, 2018, in the Nineteenth Judicial District Court alleging that the Sheriff's grant of the federal civil immigration detainer violated Montana law. Along with the complaint, Ramon filed an application for temporary restraining order ("TRO"), preliminary injunction, and order to show cause concurrently with his complaint. In response to the complaint, the Sheriff conceded the material facts, submitted evidence confirming that his office holds people in response to immigration detainers (occurring "one or two times each year"), and stated Ramon would not be released even if his family were to post bail.

¶8     After a hearing, on November 16, 2018, the District Court issued an order denying Ramon's complaint and application for TRO and preliminary injunction. The District Court first ruled that Ramon's claims were not moot and were ripe for consideration. The District Court noted the public importance of effective judicial relief on the issue and that such cases present difficulties in obtaining review due to the short-lived nature of detainers, concluding that "[u]nder Defendant's argument, the matter will never be ripe or by the time a court can review the issue it will be moot."

---

[2] *See* Transactional Records Access Clearinghouse, Syracuse Univ., *Latest Data: Immigration Customs Enforcement Detainers – Montana* (Sept. 2019), https://perma.cc/LE64-NX6Z.

¶9 However, the District Court ruled against Ramon on the merits and denied his request for preliminary injunction. The District Court concluded that under § 7-32-2203(3), MCA—Montana's statute addressing who may be confined in Montana jails—the Sheriff had authority to detain Ramon on a federal civil immigration detainer request since it provides that the jails may be used to confine "persons committed for contempt or upon civil process or by other authority of law." Section 7-32-2203(3), MCA. Ramon now appeals.[3]

¶10 On appeal, several amicus curiae briefs were filed. Supporting Ramon's argument included an amicus brief from the Montana Association of Criminal Defense Lawyers and an amicus brief from thirty-nine legal scholars. The United States filed an amicus brief supporting the Sheriff's argument.

## STANDARDS OF REVIEW

¶11 The interpretation of a statute is a question of law that is reviewed for correctness. *Mont. Dep't of Revenue v. Priceline.com, Inc.*, 2015 MT 241, ¶ 6, 380 Mont. 352, 354 P.3d 631. Where a grant or denial of an injunction is based solely upon conclusions of law, no discretion is involved, and we review the district court's conclusions of law de novo to determine whether the interpretation is correct. *City of Whitefish v. Bd. of Cnty. Comm'rs of Flathead Cnty.*, 2008 MT 436, ¶ 7, 347 Mont. 490, 199 P.3d 201.

---

[3] The Sheriff moved to dismiss Ramon's appeal as moot on the basis that Ramon was released from jail and into the custody of DHS on February 11, 2019, after sentencing in his case. This Court denied Appellee's motion and directed the parties to brief the merits of Ramon's complaint and whether "an exception to the mootness doctrine" applied.

**DISCUSSION**

¶12 Under the Montana Constitution, "physical liberty is a fundamental right, without which other constitutionally guaranteed rights would have little meaning." *In re C.H.*, 210 Mont. 184, 201, 683 P.2d 931, 940 (1984) (citing Mont. Const. Preamble; Mont. Const. art. II, §§ 3, 4, 17). Any deprivation of one's physical liberty amounts to an infringement upon the fundamental right requiring a compelling state interest sufficient to warrant such an infringement. *In re C.H.*, 210 Mont. at 201-02, 683 P.2d at 940.

¶13 Importantly, immigration detainers, like the Form I-247A used in this case, are civil in nature and do not amount to a criminal detainer or warrant. "As a general rule, it is not a crime for a removable alien to remain present in the United States," and the administrative removal process "is a civil, not criminal, matter." *Arizona v. United States*, 567 U.S. 387, 407, 132 S. Ct. 2492, 2505 (2012). Indeed, the statute governing immigration in the United States, the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 through 1537, specifically provides that certain violations of the INA are criminal offenses, while others are not. For example, it is a crime for an alien to enter the country illegally. 8 U.S.C. § 1325(a). However, "unlike illegal entry, mere unauthorized presence in the United States is not a crime." *Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012); *Arizona*, 567 U.S. at 407, 132 S. Ct. at 2505. Accordingly, "[i]llegal presence without more is only a civil violation of the act that subjects the individual to possible removal." *Lunn v. Commonwealth*, 477 Mass. 517, 522, 78 N.E.3d 1143, 1149 (2017) (citing 8 U.S.C. § 1227(a)(1)(B)).

¶14 While warrants that sometimes accompany detain requests, including Forms I-200 and I-205, are constitutionally valid in the federal immigration law enforcement context, "such warrants are civil and administrative, and not judicial, in nature." *People ex rel. Wells v. DeMarco*, 2018 NY Slip Op. 07740, ¶ 5, 168 A.D.3d 31, 41, 88 N.Y.S.3d 518, 527 (App. Div.). These administrative warrants are "civil administrative warrants approved by, and directed to, Federal immigration officials." *Lunn*, 477 Mass. at 524 n 17, 78 N.E.3d at 1151. They do not require the authorization of a judge, and, accordingly, they do not amount to a criminal arrest warrant or criminal detainer under Montana law. Section 46-1-202(4), MCA (defining "arrest warrant" as "a written order from a court").

¶15 In this case a Form I-247A, titled "Department of Homeland Security IMMIGRATION DETAINER – NOTICE OF ACTION," was issued. A DHS I-247A immigration detainer is a written request to state or local officials, asking them to (1) "[n]otify DHS as early as practicable (at least 48 hours, if possible) before an alien is released from their custody and (2) "[m]aintain custody of the alien for a period not to exceed 48 hours beyond the time when he/she would otherwise have been released from your custody to allow DHS to assume custody." U.S. Immigration and Customs Enforcement, Policy No. 10074.2: Issuance of Immigration Detainers by ICE Immigration Officers (Mar. 24, 2017), available at https://perma.cc/2DAH-DTPK; *See* U.S. Department of Homeland Security, Immigration Detainer – Notice of Action, DHS Form I-247A (Mar. 24, 2017), available at https://perma.cc/8Q7M-TY8B.

¶16 Form I-247A states that DHS has determined that there is probable cause that the subject of the request is a removable alien based on a standard set of four listed determinations and requires the DHS officer to check the appropriate box indicating their basis for probable cause for removal.[4] The Form I-247A also provides that the "alien must be served a copy of this form for the detainer to take effect." Seemingly in contradiction of Form I-247A's request to hold a suspected alien for up to 48 hours beyond the time they would otherwise be entitled to release, Form I-247A also states that the "detainer arises from DHS authorities and should not impact decisions about the alien's bail, rehabilitation, parole, *release*, diversion, custody classification, work, quarter assignments, or other matters." U.S. Department of Homeland Security, Immigration Detainer – Notice of Action, DHS Form I-247A (Mar. 24, 2017), available at https://perma.cc/RH4C-5D8Q (emphasis added).

¶17 To be clear, federal immigration Form I-247A, by its express terms, merely requests and does not impose any mandatory obligations on the state and local authorities that receive the requests. Any mandate would be contrary to the anti-commandeering principle of the Tenth Amendment of the United States Constitution. *Lunn*, 477 Mass. at

---

[4] The probable cause options include: (1) "a final order of removal against the alien"; (2) "the pendency of ongoing removal proceedings against the alien"; (3) "biometric confirmation of the alien's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law"; and/or (4) "statements made by the alien to an immigration officer and/or other reliable evidence that affirmatively indicate the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law." U.S. Department of Homeland Security, Immigration Detainer – Notice of Action, DHS Form I-247A (Mar. 24, 2017), available at https://perma.cc/8Q7M-TY8B. In this case, the fourth option was checked by the Border Patrol officer.

9

526-27, 78 N.E.3d at 1152 (citing U.S. Const. amend. X). The Tenth Amendment of the United States Constitution prohibits the federal government from compelling states to use their resources to administer and enforce federal immigration programs. *Galarza v. Szalczyk*, 745 F.3d 634, 643-44 (3d Cir. 2014) (citing *New York v. United States*, 505 U.S. 144, 112 S. Ct. 2408 (1992) and *Printz v. United States*, 521 U.S. 898, 117 S. Ct. 2365 (1997)); *see also Lunn*, 477 Mass. at 526-27, 78 N.E.3d at 1152.

¶18    In resolving this case, we first determine whether the public interest exception to the mootness doctrine applies. Next, we determine whether an immigration detainer constitutes an arrest under Montana law. Lastly, we determine whether Montana law enforcement officers have the authority under Montana law to arrest individuals pursuant to a federal immigration detainer request.

¶19    *Issue One: Whether an exception to the mootness doctrine applies to a challenge to the lawfulness of a Montana law enforcement officer detaining an individual for a suspected violation of civil immigration law at the request of the federal government.*

¶20    As provided in Article VII, Section 4(1), of the Montana Constitution, jurisdiction arises in "all civil matters and cases at law and equity." The judicial power of Montana courts is limited to justiciable controversies—in other words, a controversy that can be disposed of and resolved in the courts. *Greater Missoula Area Fedn. of Early Childhood Educators v. Child Start, Inc.*, 2009 MT 362, ¶ 22, 353 Mont. 201, 219 P.3d 881. There are several central concepts of justiciability, mootness being the relevant one here. *Greater Missoula*, ¶ 23. Where an issue presented at the outset of the action "has ceased to exist or is no longer 'live,' or if the court is unable due to an intervening event or

10

change in circumstances to grant effective relief or to restore the parties to their original position, then the issue before the court is moot." *Gateway Opencut Mining Action Grp. v. Bd. of Cnty. Comm'rs*, 2011 MT 198, ¶ 16, 361 Mont. 398, 260 P.3d 133 (citation omitted).

¶21 While an issue may be moot, we recognize several exceptions to the mootness doctrine, including the public interest exception. This Court "reserves to itself the power to examine constitutional issues that involve broad public concerns to avoid future litigation on a point of law." *Walker v. State*, 2003 MT 134, ¶ 41, 316 Mont. 103, 68 P.3d 872 (citations omitted). Accordingly, the public interest exception applies where: (1) the case presents an issue of public importance; (2) the issue is likely to recur; and (3) an answer to the issue will guide public officers in the performance of their duties. *Gateway Opencut*, ¶ 14.

¶22 Whether a state law enforcement officer has the authority to grant federal civil immigration detainers and deprive Montana residents of their fundamental right to liberty based on a suspected civil violation is an issue of public importance. We have consistently held that where questions implicate fundamental constitutional rights or where the legal power of a public official is in question, the issue is one of public importance. *See Walker*, ¶¶ 41-43 (reaching the merits of a former detainee's challenge to Montana State Prison disciplinary techniques, even though he had already been released); *Wier v. Lincoln Cnty. Sheriff's Dep't*, 278 Mont. 473, 475-76, 925 P.2d 1172, 1173 (1996) (excepting mootness where the inmate challenged his bail denial, even though he had been released, since the issue implicated the constitutional right to a

reasonable bail); *In re N.B.*, 190 Mont. 319, 322-23, 620 P.2d 1228, 1230 (1980) (concluding important constitutional questions, such as the deprivation of an individual's liberty based on a civil involuntary commitment, were not rendered moot by patient's release from Warm Springs mental health facility and observing that approximately 100 Montanans each year are involuntarily committed for three months of treatment and evaluation in that facility).

¶23   This issue implicates both a fundamental constitutional right and concerns the legal power of a public official. Article II, Section 11, of the Montana Constitution, like the Fourth Amendment of the United States Constitution, prohibits unreasonable searches and seizures and aims to protect the privacy and security of individuals.  Whether a state law enforcement officer can seize an individual and deprive that individual of his or her liberty based on a federal civil immigration detainer obviously presents a question of public importance that is relevant to both Montana law enforcement officers and residents.

¶24   An answer will benefit Montana law enforcement officers by providing authoritative guidance on an unsettled issue regarding their authority to detain individuals, particularly given that there is no Montana Supreme Court ruling addressing this issue.   Obviously for individuals like Ramon, resolving whether state law enforcement officers may grant federal civil immigration detainers and deprive them of their liberty is significant.  A resolution on this issue is also in the interest of Montana

taxpayers, considering the legal costs associated with challenges to local law enforcement detainer authority, as well as the additional costs of detaining individuals in county jails.[5]

¶25 The issue is likely to recur. Years 2017 through 2019 saw a rise in detainers in Montana with a total of 190, amounting to 35 percent (190 out of 543) of all detainers issued over the 15-year period since detainers first began in 2003.[6] There are three recent cases on this issue in Montana, including this case, *Valerio-Gonzales v. Jarrett*, OP 17-659, 390 Mont. 427, 410 P.3d 177 (table) (Dec. 28, 2017), and the ongoing case of *Soto-Lopez v. Jarrett*, Cause No. DV-19-212X (18th Judicial Dist. Ct., Gallatin County 2019). Moreover, the mere fact that Appellees argue that their actions are lawful indicate that they plan to continue operating under the same terms leading to this very same issue recurring in the future and necessitating a judicial declaration as to its legality. As long as the current ad-hoc-type agreement and policies between detention centers in Montana and DHS remains in place, "the problems will repeat themselves." *Walker*, ¶ 43. These facts present a constitutional question of "broad public concern," thus the importance of this Court's review "to avoid future litigation on a point of law." *Walker*, ¶ 41.

¶26 Accordingly, the public interest exception to mootness applies here since this case presents a question of public importance that will likely recur and whose answer will guide public officers in the performance of their duties. But for an application of the

---

[5] *E.g. Roy v. County of Los Angeles*, No. 12-cv-9012, 2018 U.S. Dist. LEXIS 27268, 2018 WL 914773 (C.D. Cal. Feb. 7, 2018) (Los Angeles County settling detainer lawsuit for $225,000); *Gomez-Maciel v. Coleman*, No. 17-cv-292 (E.D. Wash.) (Spokane, Washington, settling detainer lawsuit for $49,000).

[6] *See* Transactional Records Access Clearinghouse, Syracuse Univ., *Latest Data: Immigration Customs Enforcement Detainers – Montana* (Sept. 2019), https://perma.cc/LE64-NX6Z.

exception to the mootness doctrine, these issues threaten to go unresolved due to the transitory 48-hour period of immigration detainer requests, making full and meaningful judicial review of the issue prior to the inmate's release impossible.

¶27 *Issue Two. Whether a Montana law enforcement officer carrying out a federal detainer constitutes an arrest under Montana law.*

¶28 In order to determine whether a state law enforcement officer has the authority to grant a detainer request, we must first decide whether a federal detainer constitutes an arrest under Montana law. Appellee and the United States contend, based on several asserted arguments, that holding an individual based on a federal detainer request does not constitute an arrest under Montana law. We disagree.

¶29 There is broad consensus around the nation that an immigration detainer constitutes a new arrest. *See, e.g. Lunn*, 477 Mass. at 518, 78 N.E.3d at 1146 (holding an immigration detainer "constitutes an arrest" under Massachusetts law); *Morales v. Chadbourne*, 793 F.3d 208, 216-18 (1st Cir. 2015) (since an individual was "kept in custody for a new purpose after she was entitled to release, she was subjected to a new seizure for Fourth Amendment purposes—one that must be supported by a new probable cause justification"); *DeMarco*, 2018 NY Slip Op. 07740, 168 A.D.3d at 40, 88 N.Y.S.3d at 526 (same); *Creedle v. Miami-Dade Cnty.*, 349 F. Supp. 3d 1276, 1307-08 (S.D. Fla. 2018) (same). Tellingly, neither the United States nor the Sheriff has pointed to a single case holding that detaining an individual pursuant to an immigration detainer does not constitute an arrest. Indeed, contrary to the United States' position here, the United States has, in a separate case, conceded that immigration detainers constitute an arrest.

14

*See Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1005 (N.D. Ill. 2016) (DHS conceding that immigration detainers constitute an arrest).

¶30   Under Montana law, an "arrest is made by an actual restraint of the person to be arrested or by the person's submission to the custody of the person making the arrest." Section 46-6-104(1), MCA.   It is the "taking [of] a person into custody in the manner authorized by law."   Section 46-1-202(3), MCA.   We accord "arrest" a "broad definition determined by whether a reasonable person, innocent of any crime, would have felt free to walk away under the circumstances."   *State v. Ellington*, 2006 MT 219, ¶ 14, 333 Mont. 411, 143 P.3d 119; *see also State v. Van Dort*, 2003 MT 104, ¶ 14, 315 Mont. 303, 68 P.3d 728.   Generally, an arrest occurs when: (1) there is a claimed "purpose to take the person into the custody of the law"; (2) "under a real or pretended authority"; (3) "actual or constructive seizure or detention" of a person occurs by "touching, or putting hands on him, or by any act which indicates an intention to take him into custody and subject the person arrested to the actual control and will of the person making the arrest"; and (4) the arrested person is conscious of the restraint of his or her liberty.   *Harrer v. Montgomery Ward & Co.*, 124 Mont. 295, 305, 221 P.2d 428, 433 (1950).

¶31   An immigration detainer effectuates a new restraint on an individual who otherwise would be free to leave the custody of a local law enforcement officer.   Indeed, this Court has affirmatively held that when an individual is held for a new period of detention for a new purpose, such action is an arrest under § 46-7-101(1), MCA.   *State v. Norvell*, 2019 MT 105, ¶¶ 7, 19, 395 Mont. 404, 440 P.3d 634.   When Montana law enforcement personnel honor a DHS civil immigration detainer request that they hold a

person for up to two days after he or she would otherwise be entitled to release from State custody, the result is a new seizure and arrest of the individual for a new purpose. *See Lunn*, 477 Mass. at 527-28, 78 N.E.3d at 1153; *cf. Rodriguez v. United States*, 575 U.S. 348, 352-53, 357, 135 S. Ct. 1609, 1613, 1616 (2015) (holding that prolonging an individual's detention for a new purpose when the person would otherwise be released constitutes a new seizure, even if it only prolongs the detention for "seven or eight minutes").

¶32    In this case, the immigration detainer and the Detention Center's actions amounted to an arrest under Montana law.  Like the facts in *Norvell*, the immigration detainer here resulted in a new detention for a new purpose.  New detentions as a result of an immigration detainer meet the broad definition of an arrest, as well as the elements of an arrest under the *Harrer* decision.  First, in refusing to release Ramon upon his bail bondsman's attempt to post his bond, the Detention Center effectively took Ramon back into custody under the claimed purpose that there was an immigration detainer request by Border Patrol.  Second, the Detention Center acted under Border Patrol's federal authority in detaining Ramon.  Third, actual and constructive detention occurred since the Detention Center's statement that it would not release Ramon, even if he posted bond indicated the Detention Center's intention to keep Ramon in its custody against his will when he was otherwise entitled to post bond and be released.  Lastly, Ramon was conscious of the fact that the Detention Center would not allow his release due to the detainer request.

16

¶33 Appellee's and the United States' argument that a detainer is only extending the original arrest and does not constitute a new arrest is incorrect. It is unquestionable that an individual in Ramon's position would not have felt free to walk away under the circumstances. By informing Ramon's bondsman that he would not be released upon posting of the bond, the Sheriff kept Ramon in custody for a new purpose after he was otherwise eligible to be released. But for the grant of the immigration detainer, a reasonable person, innocent of any crime, would have felt free to leave upon posting bond.

¶34 While Ramon did not actually post bond and was never released, bond postage and actual release is not necessary to effectuate a new arrest. Denying a person held on criminal charges the opportunity to post bail and obtain release on the basis that DHS has issued an immigration detainer request amounts to a new arrest. *Mendia v. Garcia*, 768 F.3d 1009 (9th Cir. 2014); *Sanchez Ochoa v. Campbell*, 266 F. Supp. 3d 1237 (E.D. Wash. 2017). All that is necessary to effectuate a new arrest under these circumstances is an affirmative action indicating a clear commitment to post bond by the inmate and the detention center's refusal to grant the inmate's release due to the immigration detainer. *See Mendia*, 768 F.3d at 1013; *Campbell*, 266 F. Supp. 3d at 1244-45, 1250-55.

¶35 Ramon's affirmative action indicating a clear commitment to post bond occurred upon the arrival of the bail bondsman with the funds to post Ramon's bail. At this time, Ramon was entitled to release. However, the Detention Center refused to grant Ramon's release, even if his bond was posted. But for the Detention Center's grant of the detainer, Ramon would have posted his bail and been released from custody.

¶36 Finally, while reasonable administrative delays, where supported by substantial evidence, are generally allowed during processing an inmate's release, *see, e.g., Berry v. Baca*, 379 F.3d 764, 771 (9th Cir. 2004), executing an immigration detainer request is not an administrative delay; it is a further incarceration that requires the arresting officer to "provide prompt determinations of probable cause." *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 53, 56, 111 S. Ct. 1661, 1668-70 (1991); *see also Norvell*, ¶¶ 7, 19 (holding continued detention in response to a different jurisdiction's request, "valid or not," constitutes a new arrest).

¶37 *Issue Three: Whether a Montana law enforcement officer has state law authority to conduct a civil immigration arrest in response to a federal detainer request.*

¶38 It is a bedrock principle of federalism and our system of dual sovereignty that the arrest authority and limitations of Montana law enforcement officers is generally controlled by Montana law. *Printz*, 521 U.S. at 932-33, 117 S. Ct. at 2383 (holding that even a federal law that "places a minimal and only a temporary burden upon state officers" offends "the very principle of separate state sovereignty"); *City of N.Y. v. United States*, 179 F.3d 29, 36 (2d Cir. 1999) (holding the outer limits of state sovereignty "surely encompass the right to set the duties of office for state-created officials"), *cert. denied*, 528 U.S. 1115, 120 S. Ct. 932 (2000); *State v. Gateway Mortuaries, Inc.*, 87 Mont. 225, 239, 287 P. 156, 159 (1930) (holding that the Montana Legislature has the police power to define reasonable measures that are appropriate or necessary for public safety). The federal government "cannot compel the States to enact or enforce a federal

regulatory program," nor can it "circumvent that prohibition by conscripting the State's officers directly." *Printz*, 521 U.S. at 935, 117 S. Ct. at 2384.[7]

¶39    Such principle is one that is embedded in the history of our nation, as enactments of the early Congresses, "contain no evidence of an assumption that the Federal Government may command the States' executive power in the absence of a particularized constitutional authorization"; in fact, "they contain some indication of precisely the opposite assumption." *Printz*, 521 U.S. at 909-10, 117 S. Ct. at 2372. Accordingly, where there is an "absence of a Federal statute granting State officers the power to arrest for a Federal offense, their authority to do so is a question of State law." *Lunn*, 477 Mass. at 529, 78 N.E.3D at 1154 (citing *United States v. Di Re*, 332 U.S. 581, 589-90, 68

──────────

    [7] While we agree that DHS's detainer policy is not a mandatory program, the policy in conjunction with Executive Order 13,768, has similar coercive qualities as those measures found unconstitutional in *New York v. United States*, 505 U.S. 144, 112 S. Ct. 2408 (1992), *Printz*, and *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 132 S. Ct. 2566 (2012). Indeed, the policy walks a fine line between encouragement and coercion. *C.f. New York*, 505 U.S. at 175, 112 S. Ct. at 2427-28.

    According to DHS policy, anytime a local officer declines a detainer request, that local jurisdiction is then documented in the ENFORCE Alien Removal Module database. U.S. Immigration and Customs Enforcement, Policy No. 10074.2: Issuance of Immigration Detainers by ICE Immigration Officers (Mar. 24, 2017), available at https://perma.cc/2DAH-DTPK. This database acts in concert with President Trump's January 25, 2017 Executive Order 13,768 titled, "Enhancing Public Safety in the Interior of the United States." Exec. Order No. 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017). The Executive Order provides that any "jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 are not eligible to receive Federal grants," that the "Attorney General shall take appropriate enforcement action" against such jurisdictions, and that "the Secretary shall utilize the Declined Detainer Outcome Report . . . [to] make public a comprehensive list of criminal actions committed by aliens and any jurisdiction that ignored or otherwise failed to honor any detainers with respect to such aliens."

    Depending on each jurisdiction's dependence on federal funding, such policies promulgated by DHS and the President could constitute unconstitutional "economic dragooning." *See NFIB*, 567 U.S. at 523, 132 S. Ct. at 2574. The federal policy offers jurisdictions a choice: either assist in the implementation of federal immigration law or face sanctions for declining to participate. However, such attempted coercion has been found unconstitutional as applied to two California counties. *See City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1245 (9th Cir. 2018).

S. Ct. 222, 226 (1948) (concluding the authority of state officers to make arrests for federal crimes, absent federal statutory instruction, is a matter of state law)); *see also Gonzales v. Peoria*, 722 F.2d 468, 475 (9th Cir. 1983), *overruled on other grounds, Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999) (concluding the INA does not preclude local law enforcement from enforcing the criminal provisions of the Act, but state law must first grant state law enforcement officers the affirmative authority to make arrests under those provisions).

¶40    In considering this issue, we must examine whether federal statutory law, Montana statutory law, or Montana common law provides Montana officers with the authority to arrest individuals for civil violations of the INA.

**A. Federal Law**

¶41    Consistent with the principle of state sovereignty and the Tenth Amendment of the United States Constitution, throughout the INA, Congress largely limited the warrantless arrest and detention authority of state and local officials to instances where such action was authorized under state law.  In fact, Congress specifically enumerated only four "limited circumstances in which state officers may perform the functions of an immigration officer." *Arizona*, 567 U.S. at 408-09, 132 S. Ct. at 2506-07 (discussing the four circumstances).

¶42    One circumstance occurs where there is an agreement in place between the federal government and state government (known as "287(g) agreements"), at the expense of the state, allowing "authorized" state officers who have "received adequate training" to "perform a function of an immigration officer."  8 U.S.C. § 1357(g) (appropriately titled

20

"Performance of immigration officer functions by State officers and employees"). A second circumstance occurs during "an actual or imminent mass influx of aliens arriving" that "presents urgent circumstances requiring immediate Federal response." 8 U.S.C. § 1103(a)(10). Even under the mass influx circumstance, authorization of "any State or local law enforcement officer" to perform the functions of an immigration officer may only occur "with the consent of the head of the department, agency, or establishment under whose jurisdiction the individual is serving . . . ." 8 U.S.C. § 1103(a)(10). A third circumstance occurs where a state officer may perform the civil arrest and detention functions of an immigration officer when a convicted felon illegally reenters the United States. 8 U.S.C. § 1252c. However, even under this circumstance, the INA defers to the state, providing that such action is allowed "to the extent permitted by relevant State and local law." 8 U.S.C. § 1252c(a). Lastly, the fourth circumstance allows "all other officers whose duty it is to enforce criminal laws" to arrest individuals for violations of the INA's criminal prohibitions against smuggling, transporting, or harboring aliens. 8 U.S.C. § 1324. None of these circumstances apply here, as there is no consent or agreement under 8 U.S.C. § 1357(g) between the federal government and Montana and the requisite factors of §§ 1103, 1252c, and 1324 are not present.

¶43 Outside of the special parameters prescribed in §§ 1103, 1252c, and 1324, even where a 287(g) agreement is in place between the federal and state governments, arrest power is contingent on training of the state officers. *Arizona*, 567 U.S. at 409, 132 S. Ct. at 2506. DHS's own regulation provides that only those "immigration officers who have successfully completed basic immigration law enforcement training are hereby

21

authorized and designated to exercise the arrest power" of § 1357(a)(2) of the INA. 8 CFR § 287.5(c); *Arizona*, 567 U.S. at 409, 132 S. Ct. at 2506 (discussing that "agreements reached with the Attorney General must contain written certification that officers have received adequate training to carry out the duties of an immigration officer," citing to 8 U.S.C. § 1357(g)(2), 8 CFR § 287.5(c)).

¶44 Appellee's and the United States' theory that an arrest of an individual for a civil violation of the INA is lawful cooperation is incorrect. They argue that even without formal 287(g) agreements in place between the state and federal government, local jurisdictions may, upon the request of the federal government, arrest an alien for being removable under 8 U.S.C. § 1357(g)(10). That provision provides:

> (10) Nothing in this subsection shall be construed to require an agreement under this subsection in order for any officer or employee of a State or political subdivision of a State . . . (A) to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States; or (B) otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States."

8 U.S.C. § 1357(g)(10).

¶45 Appellees' theory would essentially render the purpose of 287(g) agreements meaningless. If performing the arrest authority of an immigration officer, which arguably is the highest authority granted to an immigration officer, can be done on an ad hoc basis by state and local officers, regardless of state and local law, there would be no need for states to enter into 287(g) agreements. Such a theory is incorrect. In the limited circumstances "where the act affirmatively grants authority to State and local officers to

arrest, it does so in more explicit terms than those in § 1357(g)(10)." *Lunn*, 477 Mass. at 536, 78 N.E.3d at 1159 (citing 8 U.S.C. §§ 1103(a)(10), 1252c, 1324(c), 1357(g)(1)-(9)).

¶46    When read in the context of the INA and § 1357(g) as a whole, the provision "simply makes clear that State and local authorities . . . may continue to cooperate with Federal immigration officers in immigration enforcement to the extent they are authorized to do so by their State law and choose to do so." *Lunn*, 477 Mass. at 535-36, 78 N.E.3d at 1159.   While "[t]here may be some ambiguity as to what constitutes cooperation under the federal law . . . Congress has put in place a system in which state officers may *not* make warrantless arrests of aliens based on possible removability except in specific, limited circumstances."   *Arizona*, 567 U.S. at 410, 132 S. Ct. at 2507 (emphasis added) (listing examples of what constitutes cooperation under 8 U.S.C. § 1357(g)(10), none of which include a grant of an immigration officer's arrest authority).[8]   Clearly, as explained in *Arizona*, general civil arrest authority of state officers hinges on 287(g) agreements, but "no formal agreement or special training needs to be in place for state officers to 'communicate with the [Federal Government] regarding the immigration status of any individual . . . .'"   567 U.S. at 411-12, 132 S. Ct. at 2508.

**B. Montana Statutory Law**

¶47    Since the INA generally defers to state law regarding the authority of state law enforcement officers to make warrantless arrests, as required by foundational principles

---

[8] Examples of cooperation include "responding to requests for information about when an alien will be released from [state] custody" and "situations where States participate in a joint task force with federal officers, provide operational support in executing a warrant, or allow federal officials to gain access to detainees held in state facilities." *Arizona*, 567 U.S. 410, 132 S. Ct. at 2507(citing DHS guidance materials).

of state sovereignty, we now turn to whether Montana statute provides such authority. In determining legislative intent, "an express mention of a certain power or authority implies the exclusion of nondescribed powers." *In re M.P.M.*, 1999 MT 78, ¶ 23, 294 Mont. 87, 976 P.2d 988. Montana statutes exhaustively regulate the violations officers can arrest for, and in what circumstances. They do not provide authority for warrantless civil immigration arrests.

¶48 Only in very limited circumstances do Montana statutes authorize warrantless arrests for civil violations. Montana's general warrantless arrest statute authorizes arrests only for "offense[s]," § 46-6-311(1), MCA, which are defined as "violation[s] of any *penal* statute," § 46-1-202(15), MCA (emphasis added). As defined in Title 46 of the MCA, "offense" does not include violations that are "civil in nature." *See State v. Boulton*, 2006 MT 170, ¶ 16, 332 Mont. 538, 140 P.3d 482; § 46-1-202(15), MCA. Rightly so, warrantless arrests for civil violations are rare. *See, e.g.* § 53-21-129, MCA (emergency mental health arrests); § 53-24-107, MCA (public intoxication); § 10-1-611, MCA (military arrests). Other civil arrests require judicial authorization. Sections 3-1-511 to -515, MCA (civil contempt of court requiring a judicial order); § 25-14-102, MCA (arrest authority for absconding debtor). Section 27-16-101, MCA, specifically provides that "[n]o person may be arrested before judgment in a civil action except as prescribed by this chapter." Nowhere in Title 27, chapter 16, MCA—"Arrest and Bail in Civil Actions"—is law enforcement granted arrest authority for a civil immigration violation. *See* § 27-16-102, MCA.

24

¶49  While warrantless arrests for civil violations are tightly regulated by Montana statute, the District Court, as well as the Appellee and the United States, incorrectly relied on § 7-32-2203, MCA, to provide the Detention Center with state law authority to arrest Ramon.  Specifically, the District Court held, and Appellee and the United States argue, that subsection 3 of § 7-32-2203, MCA, defining who may be confined in a detention center, provides the authority.  Section 7-32-2203(3), MCA, states that detention centers are used "for the confinement of persons committed for contempt or upon civil process or by other authority of law."  Appellee, and the United States, assert that since immigration enforcement is a civil process, § 7-32-2203(3), MCA, authorizes local jails to cooperate with federal immigration authorities.

¶50  Section 7-32-2203, MCA, is not an arrest statute and does not confer any arrest authority.  As made clear by the title of § 2203, "Who may be confined in a detention center," the section does not provide arrest authority; rather, it concerns who can be housed in a detention center after they have been validly "committed," "sentenced," or "charged with a crime and committed for trial."[9]  Section 7-32-2203, MCA.

¶51  Likewise, a detention center "means a facility established and maintained by an appropriate entity for the purpose of confining *arrested* persons or persons *sentenced* to the detention center."  Section 7-32-2241, MCA (emphasis added).  It is clear that § 2203, and the entirety of Title 7, chapter 32, part 22, MCA—"Detention Centers"— describes the operational requirements of detention centers and is not an independent

---

[9] The MCA uses the term "detention centers" to mean county jails.  *See City of Hardin v. State*, 2008 Mont. Dist. LEXIS 171, *3.

25

source of arrest authority. *See Creedle*, 349 F. Supp. 3d at 1307 (holding that a similar Florida statute did not provide an independent source of authority for local law enforcement to arrest individuals for civil immigration violations).

¶52 The theory of lawful cooperation between local law enforcement and DHS to make civil immigration arrests under Montana law is misguided. Tellingly, the Legislature has taken several actions related to increasing cooperation between local and federal officials regarding immigration enforcement, yet none authorize civil immigration arrests. *See* § 1-1-411(3), MCA, *invalidated by Mont. Immigration Justice All. v. Bullock*, 2016 MT 104, ¶¶ 45-46, 383 Mont. 318, 371 P.3d 430 (invalidated statute instructed state agencies to notify DHS of any illegal alien applying for a state service); § 61-5-147(1), MCA (allowing for communication with DHS regarding threat assessment analysis in hazardous material transport licensing decisions); § 46-6-210(2), MCA (authorizing a felony warrant arrest that was issued in another jurisdiction); § 46-30-301, MCA (authorizing warrantless extradition arrests for individuals accused of "a crime punishable by death or imprisonment for a term of 1 year or more"); § 46-31-101, MCA (authority to execute *criminal* detainers). The Legislature has specifically authorized DHS officers to conduct arrests for state crimes, § 46-6-412, MCA, yet it has not done the inverse for state officers.

¶53 Montana statutory law does not, either directly or indirectly, authorize the arrest of individuals based solely on a federal civil immigration detainer.

## C. Montana Common Law

¶54 Montana common law does not provide local law enforcement with the authority to make civil immigration arrests. First, it is an established principle that "there is no common law in any case where the law is declared by statute." Section 1-1-108, MCA. The "statutes establish the law of this state respecting the subjects to which they relate." Section 1-2-103, MCA. As discussed above, the Legislature has codified criminal and civil arrest authority and cooperation with extraterritorial jurisdictions. A law enforcement officer's "right to arrest without a warrant . . . is vested in him by law, only under circumstances defined in [statute] and if the circumstances do not exist, thus bringing into activity the authority of law, he has no power to make the arrest." *State v. Bradshaw*, 53 Mont. 96, 98, 161 P. 710, 711 (1916). Accordingly, since the Legislature has already regulated the area in question, contrary to the United States' argument, there is no Montana common law authority for civil immigration arrests.[10]

## CONCLUSION

¶55 The District Court correctly determined that the matter was not moot since the public interest exception applies. That ruling is affirmed. However, the District Court's holding that § 7-32-2203(3), MCA, provided the Sheriff with the authority to arrest Ramon for a suspected civil immigration violation on the basis of the Border Patrol's detainer request was incorrect. With the exception of the limited circumstances

---

[10] Contrary to the United States' argument here asserting that there is a common law civil arrest authority, in a recent case in Massachusetts, the United States asserted that "the INA supersedes all common law, that immigration law preempts state law, and that the federal government has the sole authority to control immigration." *Ryan v. United States Immigration & Customs Enf't*, 382 F. Supp. 3d 142, 158 (D. Mass. 2019).

discussed, neither federal law nor Montana law provide state or local Montana law enforcement officers with the authority to arrest individuals based on federal civil immigration violations.

¶56 Affirmed in part and reversed in part.


/S/ MIKE McGRATH


We Concur:

/S/ BETH BAKER
/S/ JIM RICE
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR


Justice Jim Rice, concurring.

¶57 While the subject detentive cooperation with federal authorities by the County Sheriff may have been authorized under the common law as it existed years ago, I am persuaded that the Legislature's enactment of statutes governing the particulars of arrest, particularly civil arrest, Opinion, ¶¶ 50, 54, has covered this issue, and that the law is "now declared by statute" to be as the Court holds. Opinion, ¶ 54; § 1-1-108, MCA; *State v. Berdahl*, 2017 MT 26, ¶ 14, 386 Mont. 281, 389 P.3d 254. That does not mean, and this decision addressing detention under DHS I-247A immigration detainers does not hold, that sheriffs are barred from any and all cooperation with federal authorities, such as communication between the agencies about detainees and their detention status, or cooperation in other arrest contexts.

28

¶58     I concur.


/S/ JIM RICE


Justice Dirk Sandefur and Justice James Jeremiah Shea join in the concurring Opinion of Justice Rice.


/S/ DIRK M. SANDEFUR
/S/ JAMES JEREMIAH SHEA